**The PEOPLE of the State of Colorado, Complainant**

v.

**Stephanie A. RITLAND, Respondent.**

**No. 13PDJ080.**

Office of the Presiding Disciplinary Judge of the Supreme Court of Colorado.

March 24, 2014.

---

46. C.R.C.P. 251.29(g).

**OPINION AND DECISION IMPOSING SANCTIONS PURSUANT TO C.R.C.P. 251.19(b)**

On January 28, 2014, a Hearing Board composed of RALPH A. CANTAFIO and HENRY C. FREY, members of the bar, and WILLIAM R. LUCERO, the Presiding Disciplinary Judge ("the PDJ"), held a hearing pursuant to C.R.C.P. 251.18. Katrin Miller Rothgery appeared on behalf of the Office of Attorney Regulation Counsel ("the People"), and Stephanie A. Ritland ("Respondent") appeared with her counsel, Alexander R. Rothrock. The Hearing Board now issues the following "Opinion and Decision Imposing Sanctions Pursuant to C.R.C.P. 251.19(b)."

## I. SUMMARY

Respondent engaged in misconduct in the course of seeking to adopt her second cousin's baby. She circumvented proper channels for the adoption by falsely listing her own husband as the birth father on the baby's birth certificate, and she later filed a petition for stepparent adoption in which she referred to her husband as the birth father. She also counseled her husband to falsely aver that he was the birth father in a related filing. Respondent stipulated that these actions violated Colo. RPC 1.2(d), 3.3(a)(1), 3.3(d), 3.4(b), 8.4(c), and 8.4(d), and the matter proceeded to a sanctions hearing. In light of the significant mitigating factors present here, the Hearing Board concludes that the appropriate sanction is a three-year suspension.

## II. PROCEDURAL HISTORY

The People filed a complaint on October 7, 2013, alleging Respondent violated Colo. RPC 1.2(d) (a lawyer shall not counsel a client to engage, or assist a client, in conduct that the lawyer knows is criminal or fraudulent); 3.3(a)(1) (a lawyer shall not knowingly make a false statement of material fact or law to a tribunal); 3.3(d) (in an ex parte proceeding, a lawyer shall inform the court of all material facts that would enable the court to make an informed decision); 3.4(b) (a lawyer shall not knowingly falsify evidence or either counsel or assist a witness to testify falsely); 8.4(c) (a lawyer shall not engage in conduct involving dishonesty, fraud, deceit, or misrepresentation); and 8.4(d) (a lawyer shall not engage in conduct prejudicial to the administration of justice). After receiving an extension, Respondent filed her answer on November 8, 2013.

The PDJ held an at-issue conference on December 4, 2013. On December 30, 2013,

the parties filed a "Stipulated Motion for Judgment on the Pleadings as to Rule Violations" pursuant to C.R.C.P. 251.18(d) and 12(c). In the motion, the parties stated that they did not dispute any material facts in this matter. They therefore asked the PDJ to deem admitted all of the alleged facts in the complaint and to enter judgment on the pleadings as to each claim. The parties asked the PDJ to reserve the issue of the appropriate sanction for consideration by the Hearing Board at a sanctions hearing. The PDJ granted the stipulated motion in an order dated January 7, 2014.

Before the sanctions hearing, the parties agreed to limit use of the name of Respondent's minor child to respect the privacy of the child, Respondent, and other concerned individuals. The parties were permitted to use the child's full name during the sanctions hearing; however, the PDJ directed the court reporter to record all references to the child by his initials, the PDJ sealed the audio recording of the sanctions hearing, and the Hearing Board will refer to the child by his initials in this opinion.

During the sanctions hearing on January 28, 2014, the Hearing Board considered an oral statement from Tristan Antone,[1] heard testimony from Bonnie Saltzman, Julie Johnston, Philip James, and Respondent, and considered stipulated exhibits 1–21.[2] Respondent stipulated at the sanctions hearing to imposition of a three-year suspension, but the People argued that disbarment is necessary to protect the public.

## III. *FACTS AND RULE VIOLATIONS*

Respondent took the oath of admission and was admitted to the bar of the Colorado Supreme Court on October 25, 2004, under attorney registration number 35763.[3] She is thus subject to the jurisdiction of the Colorado Supreme Court and the Hearing Board in these disciplinary proceedings.[4]

### Facts Established in the Complaint

In 2009, Cortney Johnson and Tristan Antone were involved in a romantic relationship, and Johnson became pregnant. The romantic relationship ended. Although the former couple stopped communicating with one another, Mr. Antone's mother, Lorrie Antone, kept in touch with Johnson. The Antones and Johnson live in Canada.

In early 2010, Johnson sought out Respondent, her distant relative. Unbeknownst to Mr. Antone and his mother, Johnson wanted to give her as-yet unborn baby up for adoption. Johnson asked Respondent and her husband, Todd Ritland, to consider adopting the baby. The Ritlands began planning how they could adopt Johnson's baby. It was decided that Johnson would travel to Colorado, where Respondent lived, to give birth.

Johnson told the Ritlands that the baby's birth father had abandoned her and wanted nothing to do with her or the baby. She said that the birth father told her to abort the baby and threatened to kill her if she did not do so. Based on these reports, the Ritlands did not know the birth father's identity but assumed he did not wish to assert parental rights.

Respondent learned that a nonfamilial adoption required a home study, which costs about $10,000.00. The Ritlands could not afford that expense. Respondent decided that she and her husband would adopt the baby via a familial adoption by putting Mr. Ritland's name on the birth certificate as the baby's father. Doing so would create a presumption of paternity and would avoid the need for a home study. Respondent knew at the time that doing so was not "right."

Johnson gave birth to the baby, A.R. Mr. Ritland was listed on the birth certificate as A.R.'s father, while Johnson was listed as the mother. Respondent does not recall which of the three of them filled out the birth certifi-

---

1. *See* C.R.C.P. 251.18(a) (providing that a complaining witness has a right to make an oral or written statement regarding the form of discipline).

2. Exhibit 21 is a written statement by Lorrie Antone regarding the form of discipline. *See id.*

3. Respondent's registered business address is P.O. Box 467, Strasburg, Colorado 80136.

4. *See* C.R.C.P. 251.1(b).

cate paperwork, but it was her idea and advice to her husband and to Johnson that the paperwork be completed with Mr. Ritland listed as the birth father.

Shortly after his birth, the Ritlands took A.R. home from the hospital with them, and he has lived there since.

In September 2010, Respondent filed a petition for stepparent adoption in Arapahoe County District Court. In the petition and related filings, Respondent refers to Mr. Ritland as A.R.'s birth father. Respondent also filed, on Mr. Ritland's behalf, a consent to adoption in which Mr. Ritland swears he is A.R.'s birth father. Because they were proceeding under false premises with a familial adoption, the Ritlands did not publish any kind of notice concerning the termination of the birth father's parental rights.

After A.R.'s birth, Johnson returned home to Canada. For several months, she led Ms. Antone to believe that she had custody of A.R. In March 2011, the Antones discovered that Johnson had in fact given up her baby for adoption. They contacted Respondent, and Mr. Antone filed a proceeding in Canada for custody of A.R.

Mr. Antone moved the Arapahoe County District Court to vacate A.R.'s adoption. Respondent confessed the motion, though she disputed certain facts stated therein. The court vacated A.R.'s adoption. The Ritlands then filed paternity and maternity proceedings.

### Additional Findings Based on Testimony and Evidence

At the sanctions hearing, Respondent testified at length about her background and the misconduct that brought her before this Hearing Board. Respondent was born in Ontario, Canada, and after earning a paralegal degree she moved to Colorado in 1997, ultimately becoming a U.S. citizen. She worked in Colorado Springs at a domestic violence shelter, on a domestic violence response team, and as a victim advocate before enrolling at the University of Denver law school in 2001. In the law school's family law clinic, she continued to advocate for domestic violence victims. Her volunteer work

one summer on children's rights issues at an African legal aid clinic reflects a passion for helping children that would define her career going forward.

Upon graduating from law school, Respondent moved to Florida with her new husband, Todd Ritland. She placed her newly issued Colorado law license on inactive status and worked in Florida as a child welfare caseworker, a case manager for children with mental health issues, a specialist in a children's mental health unit, and a director of a five-county office for children's mental health.

The Ritlands moved back to Colorado in 2008, and Respondent began working in the Denver area as a guardian ad litem ("GAL"). GALs are appointed to represent the best interests of a child in juvenile court matters such as dependency and neglect cases and truancy cases. Respondent also was appointed in domestic relations cases to serve as a child and family investigator.

In early 2010, when Respondent had been practicing as a GAL in Colorado for about a year and a half, she received an email from her second cousin, Johnson. Though they'd spent some time together as children, Respondent testified that she did not know Johnson as an adult. Johnson told Respondent that she was pregnant with her second child, due three weeks hence, that she was unable to care for the child, and that she wanted the child to be adopted by a family member so she could maintain some contact with the child. Johnson related that she was unmarried and unemployed. When Respondent asked about the birth father, Johnson said that he had ordered her to have an abortion, that he had threatened to kill both her and the baby if she did not abort the baby, and that he had "taken off," leaving no contact information. According to Respondent, she pressed Johnson for information about how to reach the father, but Johnson refused to provide that information or even his name. Respondent provided credible testimony that her professional background in domestic violence led her to believe that Johnson was genuinely afraid and was declining to provide information about the baby's

father out of fear; the People introduced no contrary evidence or testimony on this point.

At the time Respondent received Johnson's email, she and her husband had been trying to conceive for more than a year without success. Respondent credibly testified that she was "obsessed" with having a baby, describing the desire for a child as a "primal need." It was a "very emotional and draining time," she said. Neither she nor her husband had adequate insurance or savings to seek infertility treatments. The Ritlands decided they wanted to adopt Johnson's baby.

Respondent had no personal or professional experience with adoptions, so she did some internet research and spoke with several attorneys, including colleagues in Colorado. She learned that Canadian-born children generally cannot be adopted into the United States. Respondent also learned that since Johnson was only a second cousin, the adoption of Johnson's baby would be a nonfamilial adoption, which typically requires not only a publication process designed to notify birth parents of the proceeding but also a home study program. A magistrate judge acquaintance told Respondent that courts can waive the home study requirement but rarely do so, since the requirement helps to assure that a child receives a good placement. A home study costs at least $10,000.00 and takes about a year to complete. Respondent testified that she and Mr. Ritland could not afford to pay that sum, given that Mr. Ritland was in teacher's college, the couple lacked savings, and she had about $115,000.00 in law school loans. She did not think it was possible to borrow money from any family members. Respondent believed that she would lose the opportunity to adopt the baby if she had to complete the year-long home study; since Johnson had told her she wanted no legal responsibility for the baby, Respondent understood that Johnson would not agree to

be a temporary guardian of the baby while Respondent completed the home study.

According to Respondent, one of her colleagues raised the idea that since the birth father was absent, Mr. Ritland could be listed as the birth father on the baby's birth certificate and, after a six-month waiting period, Respondent could adopt the baby as a stepparent. Given her understanding about Johnson and the birth father, Respondent viewed this in some sense as a "no harm, no foul" action, although she also still knew it was the wrong decision. Nevertheless, Respondent made the "horrible choice" to carry out the familial adoption scheme, and she arranged for Johnson to travel to Colorado to give birth.

Johnson gave birth to A.R. on March 24, 2010. Respondent was the first person to hold A.R., and she stayed with him at the hospital. Mr. Ritland was named as A.R.'s father on the birth certificate.[5] Two days after the birth, Johnson returned to Canada, while A.R. went home with the Ritlands.

When the six-month eligibility date arrived, Respondent filed her petition for stepparent adoption in Arapahoe County District Court on September 3, 2010, naming Mr. Ritland as A.R.'s birth father.[6] On the same date, a consent to adoption was filed, in which Mr. Ritland certified that he was A.R.'s birth father.[7]

Respondent testified that she had been "obsessed with the situation" since A.R.'s birth and had misgivings about the path she'd set down. Yet she was "desperate" and "did not feel that there was any other option" because she feared losing her child. On December 14, 2010, the adoption decree was entered.

Before the adoption was finalized, Respondent had been in sporadic contact with Johnson, and Johnson had said nothing more about the birth father. But in July 2011, Johnson called Respondent to say that Mr.

5. Stip. Ex. 8.

6. Stip. Ex. 1.

7. Stip. Ex. 3. On September 3, 2010, Respondent also filed a petition to terminate the legal relationship between Johnson and A.R., again representing that Mr. Ritland was A.R.'s birth father.

Stip. Ex. 5. Three months later, she filed an affidavit of abandonment, on which Mr. Ritland signed his name as birth parent. Stip. Ex. 2. As pled in the People's complaint, neither of these filings form the basis for Respondent's rule violations.

Antone had filed a child custody suit in Canada. Respondent was "shocked and dumbfounded." She later gathered that Johnson had been emailing with Ms. Antone since A.R.'s birth, representing that A.R. in fact lived with her. According to Respondent, Johnson told her that someone had hacked into her email account to write to Ms. Antone. Respondent had no idea how to respond, but she hired an attorney for Johnson.

Days after receiving from Johnson the pleadings from Mr. Antone's lawsuit, Respondent sent a letter to Ms. Antone.[8] She apologized "that we are in this situation."[9] She explained that the Ritlands never meant to keep A.R. from any of his family, and said "we welcome you and your family to also become a part of his life," suggesting that Ms. Antone and her son come to Colorado to get to know A.R.[10] She did not, in this letter or future communications, directly acknowledge the false representations on A.R.'s birth certificate or in the adoption pleadings.

A couple of weeks later, on July 28, 2011, Respondent sent Ms. Antone a follow-up email.[11] The email makes clear that during the intervening period Respondent had spoken to Ms. Antone's lawyer, at what Respondent perceived was Ms. Antone's direction. She explained that "I don't want to speak with your attorney, I want to speak with you, as a mother to a grandmother."[12] She continued, "I don't want this to be a messy court battle. I want the adults in [A.R.'s] life to come together, in peace, to discuss what is best for him. Surely you can acknowledge that ripping him from the arms of his parents, the only parents he's ever known, is not what's best for him. If you are open to talking with me, please call me.... I want to figure out how you can be [A.R.'s] grandmother, without completely turning his life upside down...."[13] Respondent offered to pay for the Antones to visit Colorado for a long weekend. She further suggested that

they make arrangements to video conference, indicating that the Ritlands could purchase a computer and webcam for the Antones.[14] Going forward, she offered to bring A.R. to Ontario at least twice a year for visits and to shoulder the costs of the Antones visiting Colorado annually.[15] According to Respondent, this email and the email she wrote two weeks before are but two of many examples of her efforts to reach out to the Antones.

Respondent explained to the Hearing Board that she learned through Mr. Antone's Canadian custody case that Ms. Antone, rather than Mr. Antone, had primarily been in touch with Johnson regarding A.R. It was for this reason that Respondent reached out directly to Ms. Antone. Respondent also understood that Mr. Antone, who was about twenty-one at the time, still lived with his mother, as he was unemployed.

Although Respondent was not initially a party to the Canadian custody case, the judge added her as a party in September 2012 and ordered her to produce the Arapahoe County adoption file. Respondent retained the same lawyer she had hired for Johnson and gave him the adoption file. Respondent testified that she trusted her lawyer would turn the file over to the court and to Mr. Antone's lawyer in accordance with the court's order, and the People did not introduce any evidence contradicting this testimony.

The parties engaged in negotiations, and Respondent believed they had reached an agreement in principle to settle in December 2012. According to Respondent, Mr. Antone sent her a letter agreeing that A.R. could remain in the Ritlands' custody, provided Mr. Antone could have visitation rights. Respondent emailed Mr. Antone in mid-January 2013, thanking him for his decision and saying she was hoping to arrange travel to Ontario with A.R. in the second week of

---

**8.** Stip. Ex. 16.

**9.** Stip. Ex. 16.

**10.** Stip. Ex. 16.

**11.** Stip. Ex. 17.

**12.** Stip. Ex. 17.

**13.** Stip. Ex. 17.

**14.** Stip. Ex. 17.

**15.** Stip. Ex. 17.

February.[16] She asked about logistics regarding that trip and Mr. Antone's expectations for in-person visits and video or phone communications with A.R.[17] Respondent did not hear back from Mr. Antone, and the visit did not take place.

In April 2013, Respondent received a call from her attorney, who told her that the Antones had just obtained the adoption file from Arapahoe County and that, based on their discovery of Respondent's false representations, they were discontinuing settlement discussions. As Respondent tells it, she was "flabbergasted," believing that the Antones had seen the file soon after she gave it to her attorney the previous fall. To try to salvage the settlement discussions, Respondent emailed Mr. Antone on April 12, 2013, reiterating that she hadn't known of him until he filed the custody suit, apologizing for her role in the events, and imploring him not to take A.R. from the only family he had ever known.[18] When she received no response, Respondent followed up two days later.[19] She said that if Mr. Antone were willing to reach an agreement, the Ritlands would be willing to move to Canada within a few months.[20] She again begged him to consider reaching an agreement that would not take A.R. from his family.[21]

She received no answer, but on April 30, 2013, Mr. Antone moved to vacate the adoption decree in Arapahoe County, alleging Mr. Ritland had been fraudulently identified as A.R.'s birth father.[22] Immediately, Respondent confessed the motion and the court vacated the adoption decree.[23]

The Ritlands then filed paternity and maternity actions in Adams County. This time, mediation was successful: the parties agreed that Respondent would be adjudged A.R.'s legal mother, Mr. Antone would be his legal father and enjoy visitation rights, and Mr. Antone would dismiss the Canadian case. As of the sanctions hearing, Respondent said the Adams County cases were "almost over," with just some outstanding financial issues to be resolved.

In the meantime, Respondent closed her law practice in July 2013. She explained that she did not believe she could effectively represent her clients due to the stress she was under. She then took a position with the Colorado Department of Human Services as the administrator of a child care assistance program.

The Hearing Board has considered a statement offered in person by Mr. Antone, the affidavit he filed in the Arapahoe County case, and the complaint he filed with the People.[24] Mr. Antone said he attended prenatal medical appointments with Johnson. He told the Hearing Board that he meant to "raise [A.R.] as [his] own," explaining that three of Johnson's other children have been under the supervision of a Canadian child protection services agency and that she should not be a mother. In his affidavit filed in Arapahoe County, Mr. Antone did not express a wish to raise A.R., but instead said that he meant to emotionally and financially support the child, such as by supplying a car seat.[25] Beginning in October or November 2009 and continuing after A.R.'s birth, he explained, Johnson refused to communicate with him about the baby.[26] For a several-month period beginning in April 2010, he and Johnson had a series of communications, in which Johnson falsely implied that she had custody of A.R. and that she would arrange for A.R. to meet Mr. Antone.[27] No such visits took place, and Mr. Antone ultimately initiated the custody proceeding.

16. Stip. Ex. 18.

17. Stip. Ex. 18.

18. Stip. Ex. 19.

19. Stip. Ex. 20.

20. Stip. Ex. 20.

21. Stip. Ex. 20.

22. Stip. Ex. 10.

23. Stip. Exs. 11–12.

24. Stip. Exs. 9, 13.

25. Stip. Ex. 9 ¶¶ 4, 12.

26. Stip. Exs. 9, 13.

27. Stip. Ex. 13.

## Rule Violations

■ As indicated above, Respondent stipulated to each of the claims of professional misconduct in the People's complaint. Claim I establishes that Respondent violated Colo. RPC 3.3(a)(1), which prohibits a lawyer from knowingly making a false statement of material fact or law to a tribunal. Respondent violated this rule by falsely stating to the court in her petition for stepparent adoption that Mr. Ritland was A.R.'s birth father. The identity of A.R.'s birth father was material to the adoption proceeding, and Respondent knew her husband was not A.R.'s birth father.

Claim II alleges that Respondent violated Colo. RPC 3.4(b), which forbids lawyers from knowingly falsifying evidence or either counseling or assisting a witness to testify falsely. Respondent falsified evidence when she arranged to list her husband's name on A.R.'s birth certificate as the child's father. She also counseled and helped her husband to testify falsely when she filed the sworn consent to adoption in which Mr. Ritland claimed to be A.R.'s birth father.

Claim III establishes that Respondent violated Colo. RPC 8.4(c), which prohibits lawyers from engaging in conduct involving dishonesty, fraud, deceit, or misrepresentation. Respondent acted dishonestly when she planned and participated in the identification of Mr. Ritland as A.R.'s birth father on the birth certificate, a representation she knew was false. She also violated Colo. RPC 8.4(c) when she filed the petition for stepparent adoption, since the petition contained false representations that her husband was A.R.'s birth father.

Claim IV charges Respondent with violating Colo. RPC 1.2(d), which bars lawyers from counseling a client to engage, or assisting a client, in conduct that the lawyer knows is criminal or fraudulent. Respondent violated this rule in two ways. First, she assisted Mr. Ritland and Johnson in fraudulently identifying Mr. Ritland as the birth father on A.R.'s birth certificate. Second, she assisted her husband in perpetrating a fraud on the court in the stepparent adoption proceedings.

Claim V establishes that Respondent engaged in conduct prejudicial to the administration of justice in contravention of Colo. RPC 8.4(d). Respondent's submission of false evidence necessitated the vacation of the adoption decree and additional proceedings regarding A.R.'s custody. Respondent thereby wasted court time and resources.

Finally, Claim VI establishes that Respondent violated Colo. RPC 3.3(d), which provides that in an ex parte proceeding a lawyer shall inform the court of all material facts that would enable the court to make an informed decision, even if those facts are adverse. A.R.'s adoption was an ex parte proceeding in that Mr. Antone was not advised of and did not participate in the proceeding. Respondent violated Colo. RPC 3.3(d) by failing to advise the court that Mr. Ritland was not A.R.'s birth father and that A.R.'s birth father, Mr. Antone, had not been informed of or given an opportunity to participate in the adoption proceedings.

## IV. SANCTIONS

■ The American Bar Association's *Standards for Imposing Lawyer Sanctions* (1991 & Supp.1992) ("ABA *Standards*") and Colorado Supreme Court case law guide the imposition of sanctions for lawyer misconduct.[28] In imposing a sanction after a finding of lawyer misconduct, the Hearing Board must consider the duty violated, the lawyer's mental state, and the actual or potential injury caused by the lawyer's misconduct. These three variables yield a presumptive sanction that may be adjusted in consideration of aggravating and mitigating factors.

### ABA *Standard* 3.0—Duty, Mental State, and Injury

*Duty:* This case primarily involves a violation of Respondent's duty to the legal system. As an officer of the court, Respondent was obligated to adhere to the highest ethical standards in submitting pleadings and evidence, in informing the court of relevant facts, and in counseling her husband regarding his sworn statements. When she engaged in dishonest conduct, Respondent also

---

**28.** *See In re Roose*, 69 P.3d 43, 46–47 (Colo. 2003).

transgressed her duty to the public to maintain personal integrity.

*Mental State:* Respondent acted knowingly and intentionally when she filed false documents with the court regarding her husband's paternity and when she counseled her husband and Johnson to make false representations on A.R.'s birth certificate. Respondent's conduct was intentional because it was done with the conscious objective to adopt A.R. without following appropriate procedures.

*Injury:* By tainting the adoption proceeding and thereby causing the Arapahoe County District Court to waste time and resources, Respondent substantially harmed the court. More important, Respondent caused significant potential injury to the Antones.

According to Mr. Antone, he first learned in 2011 from one of his cousins that A.R. had been adopted in Colorado. He said he did not find out about Respondent's fraud until April 2013, when he saw the Arapahoe County file. In Mr. Antone's view, Respondent "used her authority as an attorney to steal [his] child." Mr. Antone said he is more than $60,000.00 in debt as a result of the Canadian and Colorado custody cases. As of the disciplinary hearing, he had only been able to see A.R. five or six times.

In the written statement she submitted, Ms. Antone echoed Mr. Antone's perspectives, saying that Respondent had been "using her position as [an] officer of the court and her education as a 'child advocate' to mislead and outright lie throughout this whole ordeal." [29] She perceives that Respondent is continuing to lie and to make false accusations about Mr. Antone, though it is unclear to what Ms. Antone is referring. Like her son, Ms. Antone believes Respondent should be disbarred.

The Hearing Board cannot be sure whether word of the adoption proceedings would

have in fact reached Mr. Antone had Respondent completed a nonfamilial adoption with the attendant publication requirement, nor can we know what steps the Antones would have taken if Respondent had not circumvented the proper channels for an adoption. However, the Antones might have learned of the proposed adoption, asserted familial rights, and developed a relationship with A.R. at an earlier date. It appears that the Antones incurred costs in asserting their rights once they became aware of the adoption. Respondent also caused potential harm to A.R. by depriving him of the possible opportunity to spend time with his birth family earlier in his formative years. The Hearing Board notes that Respondent did attempt to facilitate development of a relationship between A.R. and his birth family from July 2011 going forward, since she made multiple efforts to arrange visits with the Antones at her own expense.

### ABA *Standards* 4.0–7.0—Presumptive Sanction

The parties agree that disbarment is the presumptive sanction for Respondent's misconduct in this case, as set forth in several ABA *Standards*. ABA *Standard* 6.11 provides that disbarment is typically warranted when a lawyer, with the intent to deceive the court, makes a false statement, submits a false document, or improperly withholds material information, thereby causing a serious or potentially serious injury to a party or causing a significant or potentially significant adverse effect on the legal proceeding. ABA *Standard* 6.11 governs Respondent's violation of Colo. RPC 3.3(a)(1) (false statements to a tribunal), 3.3(d) (informing the court of material facts in an ex parte proceeding), and 8.4(d) (prejudicing the administration of justice).[30]

Disbarment is also the presumptive sanction under ABA *Standard* 6.21 when a lawyer knowingly violates a court order with the

---

29. Stip. Ex. 21.

30. Because Respondent's violation of Colo. RPC 1.2(d) is premised on her assistance to her husband, not on her own interactions with the court, the standard applicable to that claim is ABA *Standard* 6.12, which calls for suspension when a

lawyer knows that false statements or documents are being submitted to the court or that material information is improperly being withheld, taking no remedial action and causing injury or potential injury to a party or causing an adverse or potentially adverse effect on the legal proceeding.

intent to obtain a benefit for the lawyer, causing either serious or potentially serious injury to a party or serious or potentially serious interference with a legal proceeding. That standard applies to Respondent's violation of Colo. RPC 3.4(b) (falsifying evidence or assisting a witness to testify falsely).

Finally, disbarment is the presumptive sanction for Respondent's violation of Colo. RPC 8.4(c) (dishonesty, fraud, deceit, or misrepresentation) pursuant to ABA *Standard* 5.11(b).[31] That standard calls for disbarment when a lawyer engages in intentional conduct that does not involve the elements set forth in ABA *Standard* 5.11(a) but that involves dishonesty, fraud, deceit, or misrepresentation and that seriously adversely reflects on the lawyer's fitness to practice.[32]

### ABA *Standard* 9.0—Aggravating and Mitigating Factors

■ Aggravating factors are considerations or circumstances that may justify an increase in the presumptive discipline to be imposed, while mitigating factors may justify a reduction in the severity of the sanction.[33] The Hearing Board considers evidence of the following aggravating and mitigating circumstances in deciding the appropriate sanction. As explained below, we will apply three aggravating factors and eight mitigating factors (of which three merit limited weight and one carries great weight).

*Dishonest or Selfish Motive—9.22(b):* As Respondent concedes, she acted with self-interest. She made false representations on A.R.'s birth certificate to gain custody of A.R., while saving the cost of a home study and avoiding the risk that a delay in the adoption would cause Johnson to turn elsewhere or decide to raise the baby on her own. We recognize that Respondent's self-interest was of a different character from

cases in which lawyers intentionally convert money from clients or perpetrate fraud to conceal their own misconduct. Here, Respondent's false representations arose in part from a deep yearning for a child, genuine concern that Johnson could not properly care for a baby, and a desire to protect A.R. from upheaval, consistent with her professional commitment to serving children in need. Nevertheless, we find sufficient evidence of a dishonest and selfish motive to apply this factor in aggravation.

*Pattern of Misconduct—9.22(c):* Respondent's misconduct took place over an extended period encompassing the completion of A.R.'s birth certificate, the filing of the adoption petition, and Respondent's failure to inform the court of material facts before the issuance of the adoption decree. The Hearing Board considers this ongoing pattern of dishonesty as an aggravating factor.

*Multiple Offenses—9.22(d):* Respondent's conduct does not involve a sole instance of dishonest conduct. Instead, she engaged in misconduct on multiple occasions. We therefore apply this factor in aggravation.

■ *Absence of Prior Disciplinary Record—9.32(a):* Respondent has no prior disciplinary record. She had only been practicing law for about a year and a half before her misconduct, however, so we accord this mitigating factor comparatively little weight.

*Personal or Emotional Problems—9.32(c):* The Hearing Board heard credible testimony that, at the time of her misconduct, Respondent was struggling with emotional stress due to her unsuccessful efforts to conceive a child for over a year. We recognize that infertility can lead to feelings of desperation. As Bonnie Saltzman noted, "the heartbreak that [inability to conceive] brings is very extreme." We believe that Respondent's desire to have a child exerted a powerful emo-

---

31. The Hearing Board disagrees with Respondent's contention that ABA *Standard* 5.1 only applies when a lawyer has engaged in a criminal act. The introductory portion of ABA *Standard* 5.1 explains that it applies "in cases involving commission of a criminal act that reflects adversely on the lawyer's honesty, trustworthiness, or fitness as a lawyer in other respects, *or in cases with conduct involving dishonesty, fraud, deceit, or misrepresentation.*" (Emphasis added).

*See also* ABA *Standard* 5.13 Commentary (stating that situations may arise "in which the lawyer's conduct is not even criminal, but, because it is directly related to his or her professional role, discipline is required").

32. ABA *Standard* 5.11(b).

33. *See* ABA *Standards* 9.21 & 9.31.

tional pull over her and that this yearning helps to explain Respondent's decision to engage in the misconduct at issue. As Julie Johnston put it, "her emotions took over." We thus weigh this factor in mitigation.

*Timely Good Faith Effort to Make Restitution or Rectify Consequences of Misconduct—9.32(d):* Respondent asks us to apply this factor in mitigation, noting that she made efforts to allow Mr. Antone and Ms. Antone to establish a relationship with A.R. The Hearing Board finds that Respondent did make significant efforts to reach out to the Antones, offering to pay their travel expenses to visit A.R. in Colorado and even volunteering to move her family to Canada. We note, however, that Respondent did not make any voluntary efforts to rectify her dishonesty toward the court. As such, we will apply this factor in mitigation but accord it limited weight.

*Full and Free Disclosure to Disciplinary Board or Cooperative Attitude Toward Proceedings—9.32(e):* We give Respondent credit in mitigation for stipulating to the facts and rule violations at issue in this disciplinary matter. Her cooperation saved considerable prosecutorial and judicial resources and time. We also acknowledge Respondent's cooperation in stipulating to a three-year suspension.

*Inexperience in the Practice of Law— 9.32(f):* Respondent had minimal experience practicing law at the time of her misconduct. Nevertheless, this factor carries little weight in mitigation here, since Respondent knew that what she was doing was wrong.[34]

*Character or Reputation—9.32(g):* The Hearing Board heard testimony from three witnesses for Respondent. The first was Bonnie Saltzman, a juvenile and family lawyer. She met Respondent when they worked closely together as GALs, and they are now personal friends. Saltzman characterized Respondent as extremely diligent, very thorough, forthright, and a good listener in her work. She noted that with respect to the investigatory duties of a GAL, in particular, Respondent had a strong reputation in juvenile court. Saltzman observed that GALs are not paid well and that the position "takes a lot of commitment." As a friend, Saltzman praised Respondent for being caring, forthright, and direct. According to Saltzman, Respondent is "extremely upset at herself" for the situation involving A.R.'s adoption.

Respondent's second character witness, Julie Johnston, has been close friends with Respondent for over twenty years. She related that she was shocked when Respondent told her about her false statements in A.R.'s adoption, explaining, "that's not something that [Respondent] would do.... She is the type of person that does things by the book, almost ..., and I can say this as her best friend, almost to an annoying degree." According to Johnston, Respondent explained that she lied in the adoption because she felt "stuck," she did not see another option, and she knew that A.R.'s birth mother "did not have a good track record as a mother." On the whole, Johnston described Respondent as a loving, nurturing person, and someone who has "always spoken up for what was right, or what was true, or what was fair."

Philip James, another GAL, praised Respondent's professional qualities, including her willingness to reach out for help as a new GAL. He testified that she was intelligent and gained a strong understanding of how to effectively represent her clients.[35]

In sum, Respondent's character witnesses provided undisputed testimony that her character is good, she was well-respected within the GAL community, and her misconduct in this matter was an aberration—albeit a serious aberration. We also take particular note of Respondent's unwavering professional

---

**34.** *See In re Cleland,* 2 P.3d 700, 705 (Colo.2000) ("inexperience does not go far in our view to excuse or to mitigate dishonesty, misrepresentation, or misappropriation. Little experience in the practice of law is necessary to appreciate such actual wrongdoing.").

**35.** James was qualified as an expert witness in legal ethics at the sanctions hearing. Both he and Saltzman (who was not qualified as an expert) opined that disbarment is too severe a sanction in this case. The Hearing Board does not rely on those opinions in deciding the appropriate sanction, but rather relies on these witnesses' testimony for purposes of gaining a clearer understanding of Respondent's character.

dedication to helping children in need and the evidence that she ably and ethically served her clients. This factor merits significant weight in mitigation.

*Imposition of Other Penalties or Sanctions—9.32(k):* Respondent maintains that she should receive credit for this factor, arguing that the vacation of the adoption decree and uncertainty regarding A.R.'s future caused her agony. She also states that the disciplinary process made her ineligible to serve as a GAL, a child and family investigator, or a parenting-coordinator decisionmaker. In addition, Respondent voluntarily closed her law office. The People, in contrast, argue that these circumstances flow from Respondent's misconduct and are not concrete sanctions levied by an outside actor. Although some jurisdictions have construed this mitigating factor narrowly,[36] the Colorado Supreme Court has been willing to apply the factor in a relatively wide range of circumstances, including the loss of a job,[37] the voluntary closure of a law office,[38] adverse media coverage,[39] and the *possibility* of a malpractice judgment.[40] Accordingly, we deem it appropriate to consider this mitigating factor here.

*Remorse—9.32(l):* At the sanctions hearing, Respondent averred: "I let down my family, I let down my clients, I let down the courts that I used to practice in that I'm no longer going to practice in, the families that I helped, that I could help in the future, that I can't now. And I disgraced the very court that gave me the opportunity to do the one thing that I loved, which was being a [GAL], helping children. And I will forever be remorseful for the things that I did." Bonnie Saltzman also testified that Respondent expressed, in a conversation between them, concern that her actions disrupted the lives of not only her own family but also the Antones. The Hearing Board will apply this factor in mitigation.

## Analysis Under ABA *Standards* and Case Law

The Hearing Board is aware of the Colorado Supreme Court's directive to exercise discretion in imposing a sanction and to carefully apply aggravating and mitigating factors,[41] mindful that "individual circumstances make extremely problematic any meaningful comparison of discipline ultimately imposed in different cases."[42] Though prior cases are helpful by way of analogy, the Hearing Board is charged with determining the appropriate sanction for a lawyer's misconduct on a case-by-case basis.

We begin our analysis with the presumptive sanction, which without question is disbarment. The Colorado Supreme Court has drawn attention to lawyers' duties as representatives of the legal system, stating: "Lawyers serve our system of justice, and if lawyers are dishonest, then there is a perception that the system, too, must be dishonest. Certainly, the reality of such behavior must be abjured so that the perception of it may diminish."[43] A lawyer's dishonesty to the court is particularly troubling in a case such as this, where misrepresentations were both intentional and repeated, and where the lawyer did not come forward on her own initiative to assume responsibility for her actions. As such, the Hearing Board has given serious consideration to disbarring Respondent.

**36.** See *Attorney Grievance Comm'n of Md. v. Spery*, 371 Md. 560, 810 A.2d 487, 493–94 (2002) (noting that courts generally apply ABA *Standard* 9.32(k) "only where the sanctions were disciplinary or punishment in nature").

**37.** *People v. Bobbitt*, 859 P.2d 902, 905 (Colo. 1993); *People v. Brailsford*, 933 P.2d 592, 595 (Colo.1997).

**38.** *People v. Galindo*, 884 P.2d 1109, 1112 (Colo. 1994).

**39.** *People v. Crossman*, 850 P.2d 708, 711–12 (Colo.1993); *Brailsford*, 933 P.2d at 595.

**40.** *People v. Babinski*, 951 P.2d 1240, 1242 (Colo. 1998).

**41.** See *In re Attorney F.*, 285 P.3d 322, 327 (Colo. 2012); *In re Fischer*, 89 P.3d 817, 822 (Colo. 2004) (finding that a hearing board had overemphasized the presumptive sanction and undervalued the importance of mitigating factors in determining the needs of the public).

**42.** *In re Attorney F.*, 285 P.3d at 327 (quoting *In re Rosen*, 198 P.3d 116, 121 (Colo.2008)).

**43.** *In re Pautler*, 47 P.3d 1175, 1179 (Colo.2002).

On the other hand, the prevalence of mitigating factors is a salient feature of this case, and we recognize that our task in considering mitigators is to "gauge the level of danger that an attorney poses to the public." [44] In assessing whether a lawyer presents a risk of future harm to the public, courts often consider whether the misconduct at issue was an aberration. [45] Evidence of personal stressors at the time of misconduct or evidence that the lawyer's conduct was atypical when viewed in the context of his or her record of practice can help to establish that misconduct is unlikely to reoccur and that a lesser sanction may be appropriate. [46]

This principle is well-illustrated in a New Jersey decision, *Matter of Bock.* [47] In that case, a lawyer who also was a part-time municipal judge carried out an elaborate scheme to stage his own death with his paramour's assistance, leaving on an island false evidence designed to give the impression that he had drowned. [48] Despite knowing an official search for him was underway, he concealed his whereabouts by living in another state under an assumed name for five weeks until the police located him. [49] During that period, he abandoned his court office, law partner, associate, and clients,

and he diverted public funds and the police from legitimate public safety measures. [50] In mitigation, the New Jersey Supreme Court "recognized that in some instances lawyers may fall victim to a desire to encourage a relationship with another and thus may engage in conduct that is aberrational and not likely to occur again." [51] The lawyer received a six-month suspension. [52]

The inquiry into whether a lawyer's misconduct represents an aberration ties into another fundamental consideration in this sanctions analysis—whether the misconduct took place in the course of a client representation. Courts have determined that it is particularly important to impose stringent sanctions for disciplinary violations that directly relate to client representation, because such cases carry a higher risk that disciplinary violations will reoccur. [53] In *In re Elinoff*, for instance, the Colorado Supreme Court refused to depart downward from a hearing board's recommended sanction of a three-year suspension, with one year served, for a lawyer who had attempted to bribe police officers on behalf of his client. [54] In so doing, the court emphasized that the lawyer's "conduct was directly related to his practice of law." [55] This principle has been widely

---

44. *In re Cleland*, 2 P.3d at 705 ("The reason we consider mitigating factors at all is so we may gauge the level of danger that an attorney poses to the public and, ideally, to arrive at a disciplinary sanction that adequately balances the seriousness of the danger against the gravity of the misconduct.").

45. *See, e.g., People v. Eastepp*, 884 P.2d 305, 308 (Colo.1994) (finding that a lawyer's violation of felony theft and aggravated motor vehicle theft statutes represented "an aberration in the respondent's otherwise good conduct of his business responsibilities," and considering that factor in ruling that a three-month suspension would be appropriate in lieu of the longer period of suspension that normally would be warranted); *Matter of Giordano*, 123 N.J. 362, 587 A.2d 1245, 1248 (1991) (where a lawyer arranged to buy an illegal driver's license for a client, determining that the misconduct appeared to be aberrational, rather than reflecting a "flaw running so deep that he can never again be permitted to practice law").

46. *People v. Kotarek*, 941 P.2d 925, 926 (Colo. 1997); *People v. Fry*, 875 P.2d 222, 224 (Colo. 1994).

47. 128 N.J. 270, 607 A.2d 1307, 1310 (1992).

48. *Id.* at 1308.

49. *Id.*

50. *Id.* at 1310.

51. *Id.* at 1309 (quotation omitted).

52. *Id.* at 1311.

53. *See In re Perez–Pena*, 161 Wash.2d 820, 168 P.3d 408, 415 (2007).

54. 22 P.3d 60, 64 (Colo.2001).

55. *Id.; see also People v. Buckley*, 848 P.2d 353, 354 (Colo.1993) (indicating that whether lawyer misconduct was directly related to the practice of law is relevant to the imposition of sanctions); *People v. Ebbert*, 925 P.2d 274, 280 (Colo.1996) (stating that whether misconduct was directly related to the practice of law is relevant to the determination of whether retroactive discipline is appropriate); *People v. Goldstein*, 887 P.2d 634, 644 (Colo.1994) (same).

applied in other jurisdictions.[56]

In this case, Respondent engaged in misconduct while acting in furtherance of her and her husband's own shared personal interests and while filing paperwork that any prospective adoptive parent must file, rather than while representing a client in the traditional sense.[57] We find that the chances Respondent will engage in future professional misconduct are slight, both because Respondent's misconduct did not take place in the context of a traditional client representation and because the misconduct represents a deviation from her otherwise good character. The Hearing Board was struck by the almost perfect storm that coalesced in Respondent's life. That Respondent would, in the midst of her unsuccessful efforts to conceive, be offered the opportunity to adopt a baby three weeks hence defies any rule of probability. Outside of this most unlikely set of circumstances, we do not believe Respondent would again deviate from her professional responsibilities.

We bear these considerations and findings in mind when considering relevant Colorado case law. Unfortunately, we are unaware of any disciplinary cases with facts directly analogous to those present here. We do, however, draw guidance from case law discussed below, involving lawyers giving false testimony. Notably, the People have not identified any such opinions that directly support the imposition of disbarment in this matter.

The People cite *In re DeRose* in support of disbarment, but the Hearing Board finds that case to be markedly distinguishable.[58] In *DeRose*, the lawyer on eleven separate occasions purchased money orders for a client with the dishonest intent to circumvent reporting requirements.[59] He pled guilty to felony charges of structuring transactions to evade reporting requirements and aiding and abetting, and he served a four-month federal sentence.[60] The *DeRose* court analyzed the appropriate sanction in relation to other cases involving felony convictions.[61] Although three mitigating factors applied, three aggravators also were present, and in determining that disbarment was justified the Colorado Supreme Court took pains to emphasize the weight it gave to the lawyer's prior three-year suspension for having misused client funds for the benefit of his relatives and friends.[62] Because the lawyer's misconduct involved a felony and he had significant prior misconduct, and because the *DeRose* court identified those aspects as that case's defining features,[63] the Hearing Board finds *DeRose* to be of limited usefulness here.

The People also point us to *In re Cardwell*.[64] That case involved a lawyer who represented a client on separate charges of driving under the influence filed in Jefferson and Arapahoe Counties.[65] The client pleaded guilty to driving while ability impaired ("DWAI") in Jefferson County.[66] Three months later, despite knowing of the Jefferson County plea, both the lawyer and his

**56.** *See, e.g., In re Scanio,* 919 A.2d 1137, 1144 (D.C.2007) (taking into account that a lawyer's misconduct did not occur in the course of representing a client); *In re Kennedy,* 542 A.2d 1225, 1230 (D.C.1988) ("dishonest actions committed outside of the representation of a client ... need not necessarily be sanctioned to the same degree as similar acts committed in the course of representation"); *Fla. Bar v. Baker,* 810 So.2d 876, 881 (Fla.2002) (in a case involving a lawyer's forgery of legally significant documents on his own behalf, stating that "[a]lthough lawyers may be disciplined for conduct that is not related to the practice of law, this Court has recognized that misconduct not connected with the practice of law is to be evaluated differently and may warrant less severe sanctions than misconduct committed in the course of the practice of law").

**57.** We do not consider Mr. Ritland to be a client in the traditional sense. The evidence suggests

that he was a knowing and willing participant in the false statements.

**58.** 55 P.3d 126 (Colo.2002).

**59.** *Id.* at 127–28.

**60.** *Id.* at 128.

**61.** *Id.* at 130.

**62.** *Id.* at 130–31.

**63.** *Id.*

**64.** 50 P.3d 897 (Colo.2002).

**65.** *Id.* at 898.

**66.** *Id.*

client signed a plea agreement in Arapahoe County stating that the client had no prior or pending alcohol-related driving offenses.[67] At the sentencing hearing, the lawyer repeatedly represented that this was his client's first alcohol-related offense, and the judge sentenced the client to probation as a first-time offender.[68] This sentence contravened a state statute mandating imprisonment for all second-time DWAI offenders.[69] The lawyer's misrepresentations only came to the judge's attention weeks later, based on the client's own reports.[70] The lawyer pleaded guilty to attempting to influence a public servant, a class-four felony, as well as a misdemeanor charge; his conduct also violated eight separate Rules of Professional Conduct.[71] Although disbarment was the presumptive sanction, the lawyer received a three-year suspension, with just eighteen months served, in consideration of eight mitigating factors and two aggravators.[72] *Cardwell* is not on all fours with the case at bar for several reasons, including that it involved a felony conviction and misconduct committed in the course of representing a client—though it also involved misconduct occurring during a more limited timeframe. On the whole, we read *Cardwell* as more supportive of Respondent's position than the People's, as the case supports the proposition that a presumptive sanction of disbarment for false representations to a court can be reduced to a suspension where mitigating factors outweigh aggravators.

Indeed, *Cardwell* represents one of the most serious sanctions imposed by the Colorado Supreme Court for knowing misrepresentations to courts. A more lenient sanction was imposed in *People v. Kolbjornsen*, a case involving a lawyer who had been charged with speeding and failing to provide proof of insurance.[73] The lawyer brought to his trial and introduced into evidence a falsified insurance card, which misrepresented that he had insurance on the date of the speeding stop; in addition, the lawyer testified that he had insurance on the date in question.[74] Disbarment was the presumptive sanction for this misconduct.[75] Although no mitigators applied and five aggravators were present—including giving false testimony at the disciplinary hearing—the lawyer received a suspension of just a year and a day.[76]

In at least four other instances, lawyers have received mere public censures for similar misconduct. In *People v. Rolfe*, a lawyer representing a client in post-dissolution matters made knowing misrepresentations to the court about a child abuse allegation; the lawyer was publicly censured in light of the presence of four mitigating factors and just two aggravators.[77] A lawyer likewise was publicly censured in *People v. Bertagnolli* for conduct committed in the course of representing a child who had been injured in an automobile accident.[78] Although the child's medical expert testified in the arbitration proceeding that the child suffered from a certain condition, he later wrote two letters to the lawyer, saying he realized his testimony had been incorrect.[79] The lawyer, however, ignored the letters and went on to knowingly make a false statement of fact in his closing argument by referring to the doctor's erroneous conclusion.[80]

The third case is *People v. Small*, in which a lawyer was publicly censured for falsely testifying during his own litigation that he had insurance at the time of an accident and for providing elaborate yet untruthful testi-

67. *Id.* at 899.

68. *Id.*

69. *Id.*

70. *Id.* at 899–900.

71. *Id.* at 900.

72. *Id.* at 902.

73. 917 P.2d 277, 278 (Colo.1996).

74. *Id.* at 278–79.

75. *Id.* at 279.

76. *Id.*

77. 962 P.2d 981, 982–83 (Colo.1998).

78. 861 P.2d 717, 717 (Colo.1993).

79. *Id.* at 717–19.

80. *Id.* at 718–19.

mony about why he had not filed an uninsured motorist claim.[81] Finally, in *People v. Reichman*, a district attorney who headed a task force conducting undercover drug operations received a public censure for several instances of deceit.[82] Specifically, the lawyer staged a fictitious, highly public arrest of an undercover officer to rehabilitate the officer's undercover identity, filed a false criminal complaint against the officer, filed related false documents in county court, and approved of the officer's making false statements to the county judge, who was unaware of the deception.[83] On the whole, these four cases involve conduct that was somewhat less protracted than the conduct at issue in the case here. Yet the misconduct is of the same general character, and it is difficult to reconcile the public censures imposed in these cases with the disbarment recommended by the People.

In sum, the Hearing Board gave serious consideration to imposing disbarment. But ultimately, we are guided by our collective sense that—measured broadly against disciplinary case law in this and other jurisdictions and in light of the significant mitigation present here—this is not a case that warrants the harshest of punishments. We observe that other lawyers have received suspensions or public censures for a range of egregious conduct reflecting dismally on their fitness to practice law, such as rape,[84] third-degree sexual assault of a client,[85] abandoning or neglecting multiple clients,[86]

trying a criminal case while suspended from the practice of law,[87] distribution of cocaine,[88] attempting to obtain a controlled substance by making and uttering forged prescriptions,[89] and engaging in a pattern of dishonest representations to another party in a personal real estate matter.[90] Taking into account the unique circumstances Respondent faced, the improbability that her misconduct will reoccur, and the significant mitigation present, we cannot find that it would be proportionate to impose disbarment here.

## V. CONCLUSION

In this case, Respondent flouted a cardinal principle: that lawyers must tell the truth in their professional and personal lives. She should answer for this misconduct by submitting to a significant sanction. But Respondent's misconduct occurred as she was wrestling with painful personal circumstances, rather than in the course of representing a client. Moreover, her misconduct represents an aberration when viewed in light of her otherwise fine character and her commitment to using her legal training for the benefit of children in need. Under these circumstances, the Hearing Board determines that a three-year suspension is the fitting sanction.

## VI. ORDER

The Hearing Board therefore **ORDERS:**

81. 962 P.2d 258, 259 (Colo.1998). The Hearing Board recognizes that the seriousness of the misconduct in *Small* was to some degree mitigated by the fact that the false testimony did not concern a dispositive and material fact. *Id.* at 261.

82. 819 P.2d 1035, 1035–36 (Colo.1991).

83. *Id.*

84. *Brailsford*, 933 P.2d at 595–96 (imposing a suspension for one year and one day).

85. *People v. Martin*, 897 P.2d 802, 803–04 (Colo. 1995) (imposing a suspension for one year and one day).

86. *In re Corbin*, 973 P.2d 1273, 1273–76 (Colo. 1999) (suspending for three years a lawyer who neglected four clients, among other significant misconduct); *People v. Henderson*, 967 P.2d 1038, 1041–42 (Colo.1998) (suspending for three

years a lawyer who effectively abandoned four clients).

87. *People v. Ross*, 873 P.2d 728, 729–30 (Colo. 1994) (imposing a three-year suspension).

88. *People v. Rhodes*, 829 P.2d 850, 850–51 (Colo. 1992) (suspending for three years a lawyer who was convicted of distribution of cocaine after purchasing cocaine for an acquaintance on five occasions).

89. *People v. Moore*, 849 P.2d 40, 41–42 (Colo. 1993) (suspending for six months a lawyer who made and uttered forged and false prescriptions on two occasions and who attempted to obtain a controlled substance by forgery of a prescription).

90. *People v. Pierson*, 917 P.2d 275, 276 (Colo. 1996) (imposing a three-year suspension).

1. **STEPHANIE A. RITLAND,** attorney registration number 35763, is **SUSPENDED FOR THREE YEARS.** The **SUSPENSION SHALL** take effect only upon issuance of an "Order and Notice of Suspension." [91]

2. Respondent **SHALL** promptly comply with C.R.C.P. 251.28(a)-(c), concerning winding up of affairs, notice to parties in pending matters, and notice to parties in litigation.

3. Respondent also **SHALL** file with the PDJ, within fourteen days of issuance of the "Order and Notice of Suspension," an affidavit complying with C.R.C.P. 251.28(d).

4. The parties **SHALL** file any post-hearing motion or application for stay pending appeal with the Hearing Board **on or before April 14, 2014.** No extensions of time will be granted. Any response thereto **SHALL** be filed within seven days, unless otherwise ordered by the PDJ.

5. Respondent **SHALL** pay the costs of these proceedings. The People **SHALL** file a "Statement of Costs," **within fourteen days of the date of this order.** Any response thereto **SHALL** be filed within seven days, unless otherwise ordered by the PDJ.

---

[91]. In general, an order and notice of sanction will issue thirty-five days after a decision is entered pursuant to C.R.C.P. 251.19(b) or (c). In some instances, the order and notice may issue later than thirty-five days by operation of C.R.C.P. 251.27(h), C.R.C.P. 59, or other applicable rules.