FILED
01/22/2021
Clerk of the
Appellate Courts

IN THE SUPREME COURT OF TENNESSEE
Assigned on Briefs May 28, 2020

## IN RE: WINSTON BRADSHAW SITTON, BPR#018440

_____

## No. M2020-00401-SC-BAR-BP

_____

This case is a cautionary tale on the ethical problems that can befall lawyers on social media. The attorney had a Facebook page that described him as a lawyer. A Facebook "friend" involved in a tumultuous relationship posted a public inquiry about carrying a gun in her car. In response to her post, the attorney posted comments on the escalating use of force. He then posted that, if the Facebook friend wanted "to kill" her ex-boyfriend, she should "lure" him into her home, "claim" he broke in with intent to do her harm, and "claim" she feared for her life. The attorney emphasized in his post that his advice was given "as a lawyer," and if she was "remotely serious," she should "keep mum" and delete the entire comment thread because premeditation could be used against her "at trial." In the ensuing disciplinary proceedings, a Board of Professional Responsibility hearing panel found that the attorney's conduct was prejudicial to the administration of justice in violation of Rules of Professional Conduct 8.4(a) and (d). It recommended suspension of his law license for sixty days. Under Tennessee Supreme Court Rule 9, § 15.4, this Court determined that the punishment imposed by the hearing panel appeared inadequate and, after briefing, took the matter under advisement. We now hold that the sanction must be increased. The attorney's advice, in and of itself, was clearly prejudicial to the administration of justice and violated the Rules of Professional Conduct. In addition, his choice to post the remarks on a public platform amplified their deleterious effect. The social media posts fostered a public perception that a lawyer's role is to manufacture false defenses. They projected a public image of corruption of the judicial process. Under these circumstances, the act of posting the comments on social media should be deemed an aggravating factor that justifies an increase in discipline. Accordingly, we modify the hearing panel's judgment to impose a four-year suspension from the practice of law, with one year to be served on active suspension and the remainder on probation.

**Tenn. Sup. Ct. R. 9, § 15.4; Judgment of the Hearing Panel Modified**

HOLLY KIRBY, J., delivered the opinion of the court, in which JEFFREY S. BIVINS, C.J., and CORNELIA A. CLARK and ROGER A. PAGE, JJ., joined. SHARON G. LEE, J., filed a partial dissenting opinion.

Sandy Garrett and A Russell Willis, Brentwood, Tennessee, for the Petitioner, Board of Professional Responsibility.

Winston Bradshaw Sitton, Nashville, Tennessee, Respondent, pro se.

**OPINION**

FACTUAL AND PROCEDURAL BACKGROUND

This matter arises out of a series of social media posts by the respondent attorney, Winston Bradshaw Sitton. Mr. Sitton has been licensed to practice law in Tennessee since 1997.[1]

Mr. Sitton maintained a Facebook page. His Facebook profile identified him as a lawyer.

For roughly a year, Mr. Sitton was a "Facebook friend" of Lauren Houston but evidently had not met her in person. Around December 2017, Ms. Houston was in the midst of a tumultuous break-up with Jason Henderson, the father of her child. Through his Facebook connection with Ms. Houston, Mr. Sitton became aware of allegations of abuse, harassment, violations of child custody arrangement, and requests for orders of protection.

Against that backdrop, Ms. Houston wrote the following post on her Facebook page: "I need to always carry my gun with me now, don't I? Is it legal to carry in TN in your car without paying the damn state?" The post was not directed to anyone specifically but rather was aimed at Ms. Houston's Facebook audience.

Responding to Ms. Houston's post, Mr. Sitton commented:

---

[1] On August 23, 2018, Mr. Sitton was administratively suspended from the practice of law for failure to pay the professional privilege tax. For reasons not explained in the record, he has not sought reinstatement.

I have a carry permit Lauren. The problem is that if you pull your gun, you must use it. I am afraid that, with your volatile relationship with your baby's daddy, you will kill your ex _ your son's father. Better to get a taser or a canister of tear gas. Effective but not deadly. If you get a shot gun, fill the first couple rounds with rock salt, the second couple with bird shot, then load for bear.

If you want to kill him, then lure him into your house and claim he broke in with intent to do you bodily harm and that you feared for your life. Even with the new stand your ground law, the castle doctrine is a far safer basis for use of deadly force.

Replying to Mr. Sitton's post, Ms. Houston commented, "I wish he would try." In response, Mr. Sitton posted further on Ms. Houston's Facebook page:

As a lawyer, I advise you to keep mum about this if you are remotely serious. Delete this thread and keep quiet. Your defense is that you are afraid for your life _ revenge or premeditation of any sort will be used against you at trial.

Presciently, another Facebook user posted: "He's likely already seen th[is] thread!"

Consistent with Mr. Sitton's advice, Ms. Houston deleted her Facebook post. This had the effect of deleting all of the comments to her Facebook post, including her exchange with Mr. Sitton.

Sure enough, Mr. Henderson soon became aware of the Facebook exchange between Ms. Houston and Mr. Sitton. He brought screenshots of Ms. Houston's public Facebook post and the comments, including those by Mr. Sitton, to the attention of Shelby County District Attorney General Amy Weirich. General Weirich in turn passed the screenshots along to Tennessee's Board of Professional Responsibility ("Board").

The Board investigated the matter and received Mr. Sitton's explanation. In August 2018, it filed a petition for discipline against him. The petition alleged Mr. Sitton violated

Rule of Professional Conduct[2] 8.4(a)–(d)[3] by "counsel[ing] Ms. Houston about how to engage in criminal conduct in a manner that would minimize the likelihood of arrest or conviction."

Mr. Sitton admitted most of the basic facts alleged by the Board in its petition. He contended, however, that his Facebook comments were taken out of context. Mr. Sitton argued his comments could not be considered as counseling Ms. Houston on how to get away with criminal conduct and denied he had violated the Rules of Professional Conduct.[4] The hearing on the Board's petition was scheduled for November 8, 2019.

In advance of the hearing, Mr. Sitton filed a motion in limine to exclude the Facebook posts from evidence. Immediately before the hearing began, the hearing panel denied the motion on the basis that evidentiary objections were more appropriately raised in the course of the hearing. During the hearing, the Facebook posts were offered into evidence. Mr. Sitton raised no objection to their admission. Consequently, the hearing panel admitted the Facebook posts into evidence.

---

[2] Throughout this opinion, we interchangeably use Rule(s) of Professional Conduct with the abbreviated "RPC."

[3] In the relevant part, this Rule provides:

It is professional misconduct for a lawyer to:

(a) violate or attempt to violate the Rules of Professional Conduct, knowingly assist or induce another to do so, or do so through the acts of another;

(b) commit a criminal act that reflects adversely on the lawyer's honesty, trustworthiness, or fitness as a lawyer in other respects;

(c) engage in conduct involving dishonesty, fraud, deceit, or misrepresentation; [or]

(d) engage in conduct that is prejudicial to the administration of justice[.]
Tenn. Sup. Ct. R. 8, RPC 8.4.

[4] Mr. Sitton offered the Board a conditional guilty plea. After conducting a hearing on Mr. Sitton's plea, the hearing panel issued an order rejecting it. Mr. Sitton then filed a motion to recuse the hearing panel, which was denied.

Mr. Sitton attached documents to his brief with additional information about the proffered conditional guilty plea. He did not, however, seek to make the documents attached to his brief part of the record, so we do not consider them.

- 4 -

The only testimony at the hearing was that of Mr. Sitton. The record does not include a transcript of his testimony, only the hearing panel's description and findings based on his testimony.[5] In his brief to this Court, Mr. Sitton does not dispute the hearing panel's description of his testimony; rather, he disputes its inferences and conclusions.

At the time of the hearing, Mr. Sitton had not met Ms. Houston in person. Nevertheless, in his testimony, he "was able to describe her life, including her child, medical conditions, her [alleged] illegal drug use, her problems with her son's father, and other parts of her life in great detail."[6] He said he was aware of Ms. Houston's allegations that Mr. Henderson engaged in abuse and harassment and violated their child custody arrangements. Mr. Sitton understood Ms. Houston had sought orders of protection against Mr. Henderson and had brought his actions to the attention of law enforcement. At the time of their Facebook exchange, Mr. Sitton believed Mr. Henderson had recently broken into Ms. Houston's car and a judge had advised her to get a gun for personal protection. Mr. Sitton described Ms. Houston as a "troubled woman."

Mr. Sitton testified he was concerned Ms. Houston would shoot and kill Mr. Henderson and find herself in legal trouble. He acknowledged that he identified himself as a lawyer in his Facebook posts and intended to give Ms. Houston legal advice and information. He noted Ms. Houston engaged with him on Facebook about his legal advice, and he felt she "appreciated that he was helping her understand the laws of the State of Tennessee."

Mr. Sitton claimed his only intent in posting the Facebook comments was to convince Ms. Houston not to carry a gun in her car. He maintained that his Facebook posts about using the protection of the "castle doctrine" to lure Mr. Henderson into Ms. Houston's home to kill him were "sarcasm" or "dark humor."

After hearing the testimony and reviewing the Facebook posts, the hearing panel observed that Mr. Sitton felt a personal connection with Ms. Houston and empathized with her situation. It believed he "wanted to help her."

---

[5] The hearing panel described Mr. Sitton's testimony as "erratic and contradictory," but the panel said it "was able to discern what took place."

[6] The hearing panel noted that Mr. Sitton's testimony about Ms. Houston's life circumstances "was clearly hearsay," so the panel did not accept any of the alleged details of Ms. Houston's life as necessarily true.

The hearing panel, however, found not credible Mr. Sitton's assertion that he intended only to dissuade Ms. Houston from carrying a gun in her car. The panel recounted Mr. Sitton's advice to Ms. Houston "on the escalating use of force—beginning with the advice not to carry a gun in [her] car, but Taser o[r] tear gas would be ok." If Ms. Houston felt she needed more force, Mr. Sitton counseled, "then a shotgun loaded with rock salt, followed by bird shot." The hearing panel said Mr. Sitton's next remarks to Ms. Houston "included his legal advice . . . about how to plan an effective defense to murder, if she came to need lethal force." Referencing Mr. Sitton's comments on the "castle doctrine," the hearing panel emphasized that he explicitly told Ms. Houston that "if she wanted 'to kill him,' then the 'far safer basis for use of deadly force' would be to 'lure him into your house and claim that he broke in with the intent to do you bodily harm.'"

The hearing panel found unpersuasive Mr. Sitton's assertion that his "castle doctrine" comments were "sarcasm" or "dark humor," noting that this characterization was contradicted by his own testimony and Ms. Houston's posts. The hearing panel found instead that Mr. Sitton intended to give Ms. Houston legal advice about a legally "safer basis for use of deadly force." Pointing out that the Facebook comments were made in a "publicly posted conversation," the hearing panel found that "a reasonable person reading these comments certainly would not and could not perceive them to be 'sarcasm' or 'dark humor.'"[7]

The hearing panel found Mr. Sitton lacked any remorse for his actions. It acknowledged that he conceded his Facebook posts were "intemperate" and "foolish," but it also pointed out that he maintained, "I don't think what I told her was wrong."

The hearing panel gave the "most weight" to Mr. Sitton's advice that Ms. Houston delete all of the relevant Facebook posts:

[A]fter Sitton gave Ms. Houston the advice about how to kill someone and still being [sic] able to claim a defense, Ms. Houston responded, "I wish he would try." Sitton engaged further in his discussion with Ms. Houston and replied, "As a lawyer, I advise you to keep mum about this if you are

---

[7] The hearing panel brushed aside Mr. Sitton's assertion that the exhibits presented at the hearing "provide an incomplete view of the totality of Facebook posts related to his matter." It responded that the hearing panel provided Mr. Sitton "wide and extensive latitude to fully describe the entire context of his posts that day and his overall online relationship with Ms. Houston" and pointed out Mr. Sitton's acknowledgement at the hearing that he had been given such opportunity.

remotely serious. Delete this thread and keep quiet. Your defense is that you are afraid for your life. . . [.]" The Panel finds that this further advice about deleting the Facebook posts confirms that this was no joke to Sitton. He intended this as legal advice about how to best plan a defense if she was "remotely serious" about killing Mr. Henderson.

The hearing panel found this to be an aggravating factor "which justifies an increase in discipline." The hearing panel also noted aggravating factors for Mr. Sitton's substantial experience in the practice of law and his prior disciplinary history, namely, an informal admonition in 2005 and a private reprimand in 2015. Consistent with Mr. Sitton's approach to the current petition, the hearing panel noted he contested the basis for the prior discipline and took "no responsibility" for the conduct that was the reason for it.

The hearing panel observed that Mr. Sitton put on no proof of any mitigating factors, and it found none.

Based on these findings, the hearing panel concluded Mr. Sitton's act of "[g]iving advice as a lawyer about planning in advance how to claim a defense to killing someone" was "conduct that is prejudicial to the administration of justice" under RPC 8.4(d). This conduct, it found, also violated RPC 8.4(a).[8]

Based on these rule violations, the applicable aggravating factors, and no mitigating factors, the hearing panel imposed a sixty-day suspension of Mr. Sitton's license to practice law.

Neither Mr. Sitton nor the Board appealed the judgment of the hearing panel. Pursuant to Supreme Court Rule 9, § 15.4(b), once the time for appeal expired, the Board submitted to this Court a proposed order of enforcement to suspend Mr. Sitton's law license for sixty days.

In accordance with the same rule, the Court reviewed the proposed order "with a view to attaining uniformity of punishment throughout the State and appropriateness of punishment under the circumstances of each particular case." Tenn. Sup. Ct. R. 9, § 15.4(b). The Court rejected the proposed order on the basis that the proposed sixty-day suspension of Mr. Sitton's law license seemed inadequate. Pursuant to Rule 9, § 15.4(c),

---

[8] RPC 8.4(a) states that it is professional misconduct for a lawyer to "violate or attempt to violate the Rules of Professional Conduct." Tenn. Sup. Ct. R. 8, RPC 8.4(a).

- 7 -

both Mr. Sitton and the Board were given the opportunity to brief this issue.  We took the matter under advisement.

## STANDARD OF REVIEW

This Court is charged with responsibility for "promulgating and enforcing the rules that govern the legal profession as part of [our] duty to regulate the practice of law in this state."  *Bd. of Prof'l Responsibility v. MacDonald*, 595 S.W.3d 170, 181 (Tenn. 2020) (citing *Walwyn v. Bd. of Prof'l Responsibility*, 481 S.W.3d 151, 162 (Tenn. 2015); *Bd. of Prof'l Responsibility v. Cowan*, 388 S.W.3d 264, 267 (Tenn. 2012)).  Under our inherent authority in the Tennessee Constitution, we review all attorney disciplinary judgments.  *See In re Cope*, 549 S.W.3d 71, 73 (Tenn. 2018) (quoting *In re Vogel*, 482 S.W.3d 520, 530 (Tenn. 2016)).

Tennessee Supreme Court Rule 9, section 15 governs the Board's procedures in disciplinary matters.  If the Board's disciplinary counsel decides to bring formal charges against an attorney, the matter is decided by a hearing panel.  *See* Tenn. Sup. Ct. R. 9, § 15.2(a).  At the hearing, "Disciplinary Counsel must prove the case by a preponderance of the evidence."  *Id.* § 15.2(h).  After the hearing is conducted, the hearing panel submits "its findings and judgment, in the form of a final decree of a trial court, to the Board within thirty days after the conclusion of the hearing."  *See id.* § 15.3(a).  Once the hearing panel enters a judgment recommending discipline, the attorney can either appeal the decision or accept the judgment.  *See id.* § 33.  If the punishment is disbarment, suspension, or public censure, and there is no appeal from the hearing panel's decision, the Board files with this Court a notice of submission, the judgment, a proposed order of enforcement, and a protocol memorandum.  *Id.* § 15.4(b); *In re Walwyn*, 531 S.W.3d 131, 137 (Tenn. 2017).

Tennessee Supreme Court Rule 9, section 15.4 requires this Court to review any hearing panel judgment that imposes disbarment or suspension if no appeal is perfected.  We review the hearing panel's judgment "with a view to attaining uniformity of punishment throughout the State and appropriateness of punishment under the circumstances of each particular case."  Tenn. Sup. Ct. R. 9, § 15.4(b).  If the Court determines that the punishment appears inadequate or excessive, it must "issue an order advising the Board and the respondent attorney that it proposes to increase or to decrease the punishment."  *Id.* § 15.4(c).  If the Court proposes to increase the punishment, the respondent attorney is given twenty days from the date of the order to file a brief, and reply briefs are due within

twenty days of the filing of the brief of the party who bears the burden of persuasion.[9]  *Id.*; *In re Vogel*, 482 S.W.3d at 531 (quoting a previous version of the rules).

The Court ultimately "may modify the judgment of the hearing panel . . . in such manner as it deems appropriate."  Tenn. Sup. Ct. R. 9, § 15.4(c).  "[O]ur standard of review as to the recommended punishment is de novo."  *In re Walwyn*, 531 S.W.3d at 137 (citing Tenn. Sup. Ct. R. 9, § 15.4(b)–(c); *Hughes v. Bd. of Prof'l Responsibility*, 259 S.W.3d 631, 640 (Tenn. 2008)).

## ANALYSIS

The issue before the Court is whether the sanction imposed by the hearing panel is appropriate under the circumstances of this case and in uniformity with prior disciplinary decisions involving similar circumstances.  We first consider some preliminary matters raised by Mr. Sitton, then review the rule violations and attorney misconduct, and then discuss the sanction.

## I.     Preliminary

As a preliminary matter, Mr. Sitton raises several issues related to his hearing.  The Board contends we should consider those issues waived because Mr. Sitton chose not to appeal the order of the hearing panel and limit our discussion to the appropriate sanction.

We exercise our discretion to briefly consider the issues raised by Mr. Sitton.  He argues that the hearing panel failed to consider the full context of his Facebook posts.[10]  From our review, it is clear the hearing panel did not hamper Mr. Sitton's ability to introduce evidence.  His contention is actually that the hearing panel weighed the evidence incorrectly and drew erroneous conclusions.  On appeal, we do not substitute our judgment for that of a hearing panel as to the weight of the evidence on questions of fact.  *Green v. Bd. of Prof'l Responsibility*, 567 S.W.3d 700, 712 (Tenn. 2019) (citing *Bd. of Prof'l Responsibility v. Daniel*, 549 S.W.3d 90, 100 (Tenn. 2018)).  This argument is without merit.

---

[9] Tennessee Supreme Court Rule 9, section 15.4(c) also provides that the respondent attorney may request oral argument, which Mr. Sitton did.  However, in light of the COVID-19 pandemic, the Court considered the case on briefs without oral argument.

[10] Mr. Sitton argues that the hearing panel looked at his Facebook posts in isolation, contrary to Rule 106 of the Tennessee Rules of Evidence.

Mr. Sitton also maintains the hearing panel did not give him a "presumption of innocence."[11]   Attorney disciplinary proceedings are not criminal proceedings in which there is a presumption of innocence.  *See Walwyn*, 481 S.W.3d at 171 ("[A]ttorney disciplinary proceedings are not criminal proceedings." (quoting *Long v. Bd. of Prof'l Responsibility*, 435 S.W.3d 174, 186 (Tenn. 2014))); *Mabry v. Bd. of Prof'l Responsibility*, 458 S.W.3d 900, 907–08 (Tenn. 2014) (also citing *Long*, 435 S.W.3d at 186).  Rather, the burden is on the Board to establish rule violations by a preponderance of the evidence.  Tenn. Sup. Ct. R. 9, § 15.2(h).  This argument is also without merit.[12]

## II.      Rule Violations

We now consider the attorney misconduct and the rule violations at issue.  The hearing panel in this case found Mr. Sitton's Facebook comments violated subdivisions (a) and (d) of Rule of Professional Conduct 8.4.  That rule, in the relevant part, states:

It is professional misconduct for a lawyer to:

(a) violate or attempt to violate the Rules of Professional Conduct, knowingly assist or induce another to do so, or do so through the acts of another; [and]
. . .
(d) engage in conduct that is prejudicial to the administration of justice[.]

Tenn. Sup. Ct. R. 8, RPC 8.4.

The Board accurately describes this case as presenting "unique factual circumstances."  In our analysis, we focus on the actual words used by Mr. Sitton in the Facebook exchange.

---

[11] In a related argument, Mr. Sitton argues the Board's investigation was incomplete because it did not speak to Ms. Houston or retrieve evidence of his further exchanges with her. Again, the record shows Mr. Sitton was free to call Ms. Houston to testify and free to introduce additional relevant evidence.  He failed to do so.

[12] Mr. Sitton also argues that RPC 8.4, a rule adopted in some form by virtually every state in the nation, amounts to an ex post facto, vague regulation that violates the U.S. Constitution, the Tennessee Constitution, and state and federal laws.  While Mr. Sitton quotes from various constitutional and statutory provisions for support, he does so without any clear relevance and he cites no authority supporting his assertions.  This argument is without merit.

As the hearing panel observed, Mr. Sitton's initial comments were on "the escalating use of force." In response to Ms. Houston's public post about whether to carry a gun in her car, he advised:

> The problem is that if you pull your gun, you must use it. I am afraid that, with your volatile relationship with your baby's daddy, you will kill your ex _ your son's father. Better to get a taser or a canister of tear gas. Effective but not deadly. If you get a shot gun, fill the first couple rounds with rock salt, the second couple with bird shot, then load for bear.

Mr. Sitton's next comment was more troubling:

> If you want to kill him, then lure him into your house and claim he broke in with intent to do you bodily harm and that you feared for your life. Even with the new stand your ground law, the castle doctrine is a far safer basis for use of deadly force.

In these comments, Mr. Sitton gives specific advice on how to plan in advance to use "deadly force" and make it look like self-defense. He counsels that, if Ms. Houston wants "to kill" Mr. Henderson, she should "lure" him into her home, "claim" he broke in with bad intent, and "claim" she feared for her life.

Making matters worse, after Ms. Houston responded "I wish he would try," Mr. Sitton added the following:

> As a lawyer, I advise you to keep mum about this if you are remotely serious. Delete this thread and keep quiet. Your defense is that you are afraid for your life _ revenge or premeditation of any sort will be used against you at trial.

In these follow-up comments, Mr. Sitton advises Ms. Houston—"as a lawyer"—that if she is "remotely serious" about wanting to kill Mr. Henderson, she should "keep mum," delete the comment thread, and "keep quiet." He cautions her that premeditation can be used against her "at trial," so she should hide the fact that there was a plan in advance to make her use of deadly force appear as self-defense.

The hearing panel did not make a finding about whether Ms. Houston should be considered to have been a "client" of Mr. Sitton at the time of the Facebook posts.[13] Nevertheless, the hearing panel rightly characterized Mr. Sitton's statements as gratuitous legal advice. Mr. Sitton emphasized his status "as a lawyer" in the exchange, his Facebook profile likewise identified him as a lawyer, and his comments discuss her legal defense "at trial." Mr. Sitton does not dispute the fact that Ms. Houston perceived his comments as legal advice. Importantly, others reading Mr. Sitton's public comments could reasonably have had that same perception.

Perhaps most surprising, Mr. Sitton's injudicious advice was virtually unprompted. As the Board observes: "What began as a question by Ms. Houston regarding the legality of carrying a gun for defensive purposes morphed into Mr. Sitton providing advice on how to 'lure' Mr. Henderson into her home in order to kill him."

Lawyers may of course offer advice on the legal consequences of a proposed course of conduct and may offer counsel on the meaning or application of the law. *See* Tenn. Sup. Ct. R. 8, RPC 1.2(d). That is not what Mr. Sitton did here. In his capacity as a lawyer, Mr. Sitton offered specific legal advice on how to orchestrate a killing in a way calculated to provide the perpetrator a fabricated defense to criminal charges. Then, in an ultimately unsuccessful effort to conceal the conversation, he directed Ms. Houston to delete the comment thread. Our rules do not permit lawyers to offer advice on how to commit crime with impunity.

The hearing panel interpreted Mr. Sitton's comments similarly. It said that Mr. Sitton gave "legal advice to Ms. Houston about how to plan an effective defense to murder, if she came to need lethal force. This sounds harsh—but that is what happened here. . . . Fortunately for everyone involved, it never came to that." In his brief, Mr. Sitton protests

---

[13] In its conclusion that Mr. Sitton's social media posts violated Ruel 8.4(d), the hearing panel referenced RPC 1.2(d) in a footnote. This provision states:

> A lawyer shall not counsel a client to engage, or assist a client, in conduct that the lawyer knows or reasonably should know is criminal or fraudulent, but a lawyer may discuss the legal consequences of any proposed course of conduct with a client and may counsel or assist a client to make a good faith effort to determine the validity, scope, meaning, or application of the law.

Tenn. Sup. Ct. R. 8, RPC 1.2(d).

- 12 -

repeatedly that he did not have the requisite "mens rea"[14] or intent to support a finding that he violated the rules governing lawyers.  He argues he never intended for Ms. Houston to take his words literally; rather, he meant them as a caution, "hyperbolic, dark sarcasm" intended to persuade Ms. Houston to use non-lethal force and prevent her from inadvertently killing Mr. Henderson.  He explains his words were "written in haste" and characterizes them as perhaps "harsh or intemperate or offensive."  He insists he was using "sarcastic black humor" to "emphasize the gravity" of Ms. Houston's Facebook comments and "shock [her] out of her delusion that an extended discussion of the murder of her abuser . . . was acceptable."  (Emphasis omitted).  In Mr. Sitton's view, the hearing panel's conclusion that he was instructing Ms. Houston on "how to commit murder" is "wild speculative theory."  In support, he points to the fact that his comments were in a public forum:

> [T]he Panel's speculative theory cannot . . . be reconciled with the fact that the correspondence was in public _ in plain view.  There is no conceivable reason that Petitioner, a lawyer with nearly 30-years of experience in New York and Tennessee, would have been stupid enough to publish such words openly in public view had there been any sinister intent or were this instruction to be taken literally.

We agree with Mr. Sitton that it is hard to conceive of any reason why a lawyer, any lawyer, would offer instructions on how to commit murder and stage a concocted defense.  But we disagree with Mr. Sitton that his publication of the advice on a public platform such as Facebook cuts in favor of his position.  To the contrary, as discussed in detail below in our analysis of the aggravating and mitigating factors, Mr. Sitton's decision to publish these comments on a public forum made his situation exponentially worse.

For now, it suffices to say that the hearing panel rejected Mr. Sitton's assertion that his Facebook comments were "sarcasm" or "dark humor," intended only to convince Ms. Houston not to carry a gun in her car.  This finding hinged in part on the hearing panel's

---

[14] Mr. Sitton acknowledges that "mens rea" relates to criminal proceedings. As we have pointed out, attorney disciplinary proceedings are not criminal proceedings. *Long*, 435 S.W.3d at 186.

Moreover, as noted in the Preface to the ABA Standards for Imposing Lawyer Sanctions, the ABA specifically rejected an approach to lawyer sanctions based primarily on the lawyer's "intent" in favor of an approach that considers (1) the lawyer's ethical duty to the client, the public, the legal system and the profession; (2) the lawyer's "mental state"; and (3) "the amount of injury caused by the lawyer's misconduct." ABA Standards for Imposing Lawyer Sanctions, Preface (amended 1992); *see Cowan*, 388 S.W.3d at 268.

assessment of Mr. Sitton's credibility, as well as the plain meaning of the words used in his social media posts. Credibility and the weight given to evidence are questions of fact; our standard of review requires us to give deference to the findings made by the hearing panel. Tenn. Sup. Ct. R. 9, § 33.1(b) ("[T]he court shall not substitute its judgment for that of the hearing panel as to the weight of the evidence on questions of fact."); *Lockett v. Bd. of Prof'l Responsibility*, 380 S.W.3d 19, 24 (Tenn. 2012) (citing an older version of this Court's rules). The evidence and the plain meaning of the language used by Mr. Sitton support the hearing panel's finding.

As to the rule violations, the hearing panel concluded: "Giving advice as a lawyer about planning in advance how to claim a defense to killing someone is conduct that is prejudicial to the administration of justice in violation of Rule 8.4(d)." It found that this violation "also constitutes a violation of Rule 8.4(a)."

We agree. We hold there is ample evidence to support the hearing panel's conclusion that Mr. Sitton violated RPC 8.4(a) and (d) and that he is subject to discipline.

## III. Appropriateness of Punishment

We next address whether the punishment imposed by the hearing panel is appropriate under the circumstances of Mr. Sitton's case. *See* Tenn. Sup.Ct. R. 9, § 15.4(b). To determine the appropriate punishment, the Court looks first to the American Bar Association's Standards for Imposing Lawyer Sanctions ("ABA Standards"). *See In re Vogel*, 482 S.W.3d at 533; *see also* Tenn. Sup. Ct. R. 9, § 15.4(a) ("In determining the appropriate type of discipline, the hearing panel shall consider the applicable provisions of the ABA Standards for Imposing Lawyer Sanctions.").

The ABA Standards serve as "guideposts" for determining the appropriate punishment rather than "rigid rules" that would dictate any particular outcome. *In re Vogel*, 482 S.W.3d at 533–34 (quoting *Hyman v. Bd. of Prof'l Responsibility*, 437 S.W.3d 435, 447 (Tenn. 2014)). As this Court has explained:

> The Standards recommend the type of sanction—such as disbarment or suspension—that the ABA Sanctions Committee deems generally appropriate for various kinds of misconduct. As the Preface explains, the ABA model does not consider the intent of the attorney but looks instead to the duty violated, the attorney's mental state, and any actual or potential injury. Standards 4, 5, and 6 classify conduct according to whom a duty is

owed—whether clients, the public, or the legal system—while Standard 7 addresses violations of other duties owed as a professional.

*Cowan*, 388 S.W.3d at 268 (emphasis omitted); *see also* ABA Standards for Imposing Lawyer Sanctions, Preface, 3.0 (amended 1992) [hereinafter "ABA Standard __"]; *Green*, 567 S.W.3d at 715. This process results in a presumptive or "baseline" sanction.

Once the presumptive sanction is identified, aggravating or mitigating factors may indicate that a greater or lesser sanction is appropriate. *Cowan*, 388 S.W.3d at 268; *see* ABA Standards 9.1, 9.21, 9.31. The factors listed in Standards 9.22 and 9.32 are "illustrative rather than exclusive." *Cowan*, 388 S.W.3d at 268 (quoting *Lockett*, 380 S.W.3d at 28). "Other factors may also be considered." *Id*.

### A. Presumptive Sanction

Once a hearing panel establishes that an attorney violated the Rules of Professional Conduct, our rules require the hearing panel to ascertain the presumptively appropriate sanction by "consider[ing] the applicable provisions of the ABA Standards for Imposing Lawyer Sanctions." Tenn. Sup. Ct. R. 9, § 15.4(a); *see Bd. of Prof'l Responsibility v. Justice*, 577 S.W.3d 908, 933 (Tenn. 2019) (citing *Bd. of Prof'l Responsibility v. Barry*, 545 S.W.3d 408, 420 (Tenn. 2018)), *cert. denied*, 140 S. Ct. 1212 (2020). In this case, the hearing panel determined the recommended sanction without identifying the ABA Standards on which it relied.

In its brief to this Court, the Board notes that the ABA Standards do not expressly describe the fact pattern in this case. We agree. However, even in cases where the facts do not fit neatly within the ABA Standards, it is necessary for hearing panels in attorney disciplinary matters to follow the procedural steps and ascertain the presumptive sanction under the ABA Standards before deciding the appropriate sanction for the violation at issue. Following this established process is imperative to ensure that lawyer discipline is fairly and consistently administered.

In the absence of a finding by the hearing panel on the appropriate ABA Standard, we will make that determination. For the rule violations found by the hearing panel, the Board suggests an array of ABA Standards. It first references the ABA Standards grouped under Section 5.0 on violation of duties owed to the public, specifically noting Standards 5.11 and 5.12:

5.0 Violations of Duties Owed to the Public

5.1 Failure to Maintain Personal Integrity

Absent aggravating or mitigating circumstances, upon application of the factors set out in Standard 3.0, the following sanctions are generally appropriate in cases involving commission of a criminal act that reflects adversely on the lawyer's honesty, trustworthiness, or fitness as a lawyer in other respects, or in cases with conduct involving dishonesty, fraud, deceit, or misrepresentation:

5.11 Disbarment is generally appropriate when:

(a) a lawyer engages in serious criminal conduct a necessary element of which includes intentional interference with the administration of justice, false swearing, misrepresentation, fraud, extortion, misappropriation, or theft; or the sale, distribution or importation of controlled substances; or the intentional killing of another; or an attempt or conspiracy or solicitation of another to commit any of these offenses; or

(b) a lawyer engages in any other intentional conduct involving dishonesty, fraud, deceit, or misrepresentation that seriously adversely reflects on the lawyer's fitness to practice.

5.12 Suspension is generally appropriate when a lawyer knowingly engages in criminal conduct which does not contain the elements listed in Standard 5.11 and that seriously adversely reflects on the lawyer's fitness to practice.

ABA Standards 5.0–5.12.  As can be seen, these standards reference both suspension and disbarment as appropriate presumptive sanctions.  The Board asserts Standards 5.11 and 5.12 are applicable because Mr. Sitton "advised Ms. Houston about how to commit a serious crime, as well as how to prepare—ahead of time—a potential defense to the same." It argues his comments could be considered dishonest conduct that seriously adversely reflects on his fitness to practice law, "if not an attempt to conspire with Ms. Houston within 5.11(a)."

The Board next cites several ABA Standards grouped in Section 6.0 on the violation of duties owed to the legal system.  It first specifies Standards 6.11 and 6.12:

- 16 -

6.0 Violations of Duties Owed to the Legal System

6.1 False Statements, Fraud, and Misrepresentation

Absent aggravating or mitigating circumstances, upon application of the factors set out in Standard 3.0, the following sanctions are generally appropriate in cases involving conduct that is prejudicial to the administration of justice or that involves dishonesty, fraud, deceit, or misrepresentation to a court:

> 6.11 Disbarment is generally appropriate when a lawyer, with the intent to deceive the court, makes a false statement, submits a false document, or improperly withholds material information, and causes serious or potentially serious injury to a party, or causes a significant or potentially significant adverse effect on the legal proceeding.

> 6.12 Suspension is generally appropriate when a lawyer knows that false statements or documents are being submitted to the court or that material information is improperly being withheld, and takes no remedial action, and causes injury or potential injury to a party to the legal proceeding, or causes an adverse or potentially adverse effect on the legal proceeding.

ABA Standards 6.0–6.12. These standards likewise identify both suspension and disbarment as appropriate presumptive sanctions. As to Standards 6.11 and 6.12, the Board argues that, had Ms. Houston followed Mr. Sitton's advice, it could have caused serious injury to Mr. Henderson and a significant adverse effect on the criminal proceedings against Ms. Houston.

Finally, the Board contends that ABA Standards 6.21 and 6.22, under Section 6.2, are applicable:

> 6.0 Violations of Duties Owed to the Legal System
> . . . .
> 6.2 Abuse of the Legal Process

> Absent aggravating or mitigating circumstances, upon application of the factors set out in Standard 3.0, the following sanctions are generally

appropriate in cases involving failure to expedite litigation or bring a meritorious claim, or failure to obey any obligation under the rules of a tribunal except for an open refusal based on an assertion that no valid obligation exists:

> 6.21 Disbarment is generally appropriate when a lawyer knowingly violates a court order or rule with the intent to obtain a benefit for the lawyer or another, and causes serious injury or potentially serious injury to a party, or causes serious or potentially serious interference with a legal proceeding.

> 6.22 Suspension is generally appropriate when a lawyer knows that he or she is violating a court order or rule, and causes injury or potential injury to a client or a party, or causes interference or potential interference with a legal proceeding.

ABA Standards 6.0, 6.21–6.22. The Board contends Mr. Sitton recognized the Facebook exchange was improper, and that is why he advised Mr. Houston to delete the comment thread. This, the Board argues, was preemptively interfering with a legal proceeding, so Standards 6.21 and 6.22 are applicable.

Mr. Sitton argues none of these ABA Standards are applicable. He insists he did not engage in criminal conduct, did not incite murder, and did not submit false or inappropriate statements in any legal proceeding. He characterizes the Board's narrative as false and intentionally defamatory, maintaining there is no basis for suspension of his law license.

We agree with Mr. Sitton that none of these standards are exactly on point. That alone, however, does not render them inapplicable. A rule violation need not be hand in glove with an ABA Standard in order to consider that standard applicable. As noted above, the Standards are "guideposts" to be considered when they bear some relevance to the misconduct at issue. *In re Vogel*, 482 S.W.3d at 533; *see also Daniel*, 549 S.W.3d at 102 (We "may consider the full panoply of sanctions applicable to lawyer misconduct . . . , even if a particular ABA Standard does not explicitly describe the fact pattern in question." (citing *Cowan*, 388 S.W.3d at 270)); *Green*, 567 S.W.3d at 715–16 (agreeing with hearing panel's consideration of multiple presumptive sanctions).

We consider Standards 6.21 and 6.22 first. At first blush, these standards, when read in isolation, may appear applicable. As this Court has explained, however, the

- 18 -

standards must be read in their entirety, including any prefatory provisions. *Hyman*, 437 S.W.3d at 448. Here, Standards 6.21 and 6.22 are preceded by Section 6.2, which indicates that the standards that follow apply in cases involving matters such as failure to "expedite litigation," "bring a meritorious claim," or "obey any obligation under the rules of a tribunal." As in *Hyman*, 437 S.W.3d at 448, the "conduct that triggers" ABA Standards 6.21 and 6.22 is not alleged in Mr. Sitton's case, so those standards are inapplicable.

With regard to ABA Standards 5.11 and 5.12, Mr. Sitton's conduct was not found by the hearing panel to be criminal as such, so they are not directly applicable. But he in fact offered advice on how to use deadly force and concoct a false defense; the potential criminal consequences of this conduct, we believe, are enough to consider Standards 5.11 and 5.12 potentially applicable. These standards reflect presumptive sanctions of suspension and disbarment.

Standards 6.11 and 6.12 are the most clearly applicable standards. Section 6.1 groups standards applicable to "conduct that is prejudicial to the administration of justice." Under Standard 6.11, disbarment is appropriate for an attorney "with the intent to deceive the court, ma[de] a false statement, submit[ted] a false document, or improperly with[eld] material information, and . . . cause[d] a significant or potentially significant adverse effect on the legal proceeding." ABA Standard 6.11. Although Mr. Sitton did not himself make a false statement, he offered Ms. Houston counseling on how to do so by falsely claiming self-defense. Standard 6.12 provides that suspension is appropriate where the attorney "knows that false statements or documents are being submitted or that material information is improperly . . . withheld . . . and . . . causes an adverse or potentially adverse effect on the legal proceeding." ABA Standard 6.12. In this case, we are dealing with a scenario spun by Mr. Sitton to Ms. Houston, rather than false statements made in an actual proceeding. Had Mr. Sitton's advice been acted upon, however, it would have resulted in Ms. Houston falsely claiming a fabricated defense to murder or attempted murder. This certainly would qualify as a "significant adverse effect" on a legal proceeding.

Thus, either disbarment or suspension would be a reasonable presumptive sanction. In this case, Mr. Sitton did not make any false statements himself, and did not necessarily urge Ms. Houston to commit a crime and falsify a defense. Rather, he gave Ms. Houston the tools to use deadly force against Mr. Henderson if she chose to, in a way calculated to make it appear to be self-defense. The question is close, but on balance, the facts here more closely fit ABA Standards 5.12 and 6.12. This makes suspension rather than disbarment the appropriate presumptive sanction in this case.

- 19 -

## B. *Aggravating and Mitigating Factors*

"Next, aggravating and mitigating factors are considered to determine whether the presumptive sanction should be increased or decreased." *Green*, 567 S.W.3d at 715 (citing *Cowan*, 388 S.W.3d at 268).

In determining the aggravating factors in this case, the hearing panel noted that Mr. Sitton has substantial experience in the practice of law; he has been licensed to practice law in Tennessee since 1997. He has a prior history of discipline, an informal admonition in 2005 and a private reprimand in 2015 for conduct not similar to the conduct presently at issue. Both of these circumstances point to an increase in discipline.

As a further aggravating factor, the hearing panel placed significant emphasis on Mr. Sitton's direction to Ms. Houston that she delete the Facebook comment thread to avoid leaving a trail that would reveal his advice to her. The hearing panel said this instruction confirmed that the comment thread was "no joke to [Mr.] Sitton" and justified an increase in discipline. We agree.

The hearing panel also found that Mr. Sitton had "no remorse" for his actions and did not think what he told Ms. Houston "was wrong." In his brief to this Court, Mr. Sitton disputes this finding:

> Petitioner does not deny any culpability in this matter. He admitted . . . that his language, written in haste and then, after deleted by Ms. Houston, completely forgotten, was indeed intemperate, intentionally so in order to get Ms. Houston's attention, and, to the extent viewed by third parties subject to the misunderstanding and confusion as evident in the extreme reaction by both the Board and the Panel.
>
> Petitioner humbly, sincerely and with the strongest feeling of regret, accepts responsibility for any negligence in the use of language and has, contrary to the Board's assertions, expressed remorse from the onset.

As with the finding on whether Mr. Sitton intended for his advice to be taken seriously, the hearing panel's finding on whether Mr. Sitton had remorse for his misconduct hinges on an assessment of his credibility. Our standard of review requires us to give deference to the credibility determinations made by the hearing panel. Tenn. Sup. Ct. R. 9, § 33.1(b); *Lockett*, 380 S.W.3d at 23–24 (citation omitted).

Mr. Sitton's brief to this Court supports the hearing panel's finding. Remorse in this context means more than mere regret at having engaged in conduct that resulted in disastrous consequences to the offending attorney. It must include taking responsibility by appreciating and acknowledging the seriousness of the attorney's misconduct. In his brief to this Court, Mr. Sitton continues to claim this is all just a gross misunderstanding. This is not taking responsibility.

There can be no mistaking the meaning of the words used by Mr. Sitton in his Facebook posts. "If you want to kill [Mr. Henderson], then lure him into your house and claim that he broke in with intent to do you bodily harm and that you feared for your life." Without question these are instructions on how to kill Mr. Henderson and manufacture a claim of self-defense. "As a lawyer, I advise you to keep mum about this if you are remotely serious. Delete this thread and keep quiet. Your defense is that you are afraid for your life . . . ." Undeniably, these are directions for concealing the plan to fabricate a defense to criminal charges for killing Mr. Henderson. While Mr. Sitton may genuinely regret having posted the social media comments, his consistent minimizing of them shows he has yet to appreciate the plain meaning of the words he posted and their potential serious consequences. *See* ABA Standard 9.22(g) (listing attorney's refusal to acknowledge the wrongful nature of his conduct as an aggravating factor). This aggravating factor justifies an increase in discipline.

The hearing panel found no mitigating factors. Apart from his claimed remorse, Mr. Sitton's brief does not point to any mitigating circumstances.

In addition to the hearing panel's findings on aggravating and mitigating factors, we must consider an additional circumstance. As we have already noted, the factors listed in ABA Section 9 are illustrative, not exclusive, and other factors may be considered. *Cowan*, 388 S.W.3d at 268 (citing *Lockett*, 380 S.W.3d at 28). In this case, it is appropriate to consider—as an aggravating factor—the fact that Mr. Sitton's comments were made in a very public setting, on social media.

Mr Sitton's statements to Ms. Houston would have constituted a violation of our ethics rules had they been made in private or in public, for the reasons we have already explained. Here, however, in contemplating the appropriate discipline, the Court must also consider the fact that Mr. Sitton chose to give Ms. Houston his fateful advice on Facebook, a public platform.[15] The larger Facebook audience for the exchange would have come

---

[15] The record does not indicate whether Ms. Houston's Facebook page was public or private. This does not make a difference in our analysis. *See infra* note 16.

away thinking: this is what lawyers do; they give advice on how to commit crimes and get away with it. Publicly fostering such a distorted image of the role of lawyers does grave damage to the administration of justice in our State.

We acknowledge Mr. Sitton's apologia that his comments were "intemperate" and "written in haste." Certainly, spur-of-the-moment posts on social media may feel almost like private text messages to a friend made on a cell phone alone in one's home. Unfortunately, that perception is far from the reality.

Of course, there is nothing wrong with lawyers participating in social media. Indeed, much good can come of it. Lawyers can establish an online presence, engage in their communities, show their personalities and interests outside the law, develop relationships on social-media platforms, and market their legal services. Lawyers participating in social media can do much to de-mystify the legal system.

Nevertheless, attorneys in any setting—including on social media platforms— remain bound by our Rules of Professional Conduct. *See In re Vogel*, 482 S.W.3d at 545 (All attorneys licensed to practice law in this state have a duty to "act at all times, both professionally and personally, in conformity with the standards imposed upon members of the bar as conditions for the privilege to practice law.").[16] Lawyers who choose to post on social media must realize they are handling live ammunition; doing so requires care and judgment. Social media posts are widely disseminated, and the damage from a single ill-advised comment is compounded and magnified.[17]

The fact that ethically problematic conduct occurs on a social media platform need not always be an aggravating circumstance. However, if the use of social media exacerbates the problem the ethics rule seeks to address, we hold that it may be considered an aggravating factor for purposes of lawyer discipline. Here, Mr. Sitton's choice to post his comments on a public platform amplified their deleterious effect. We can think of few

---

[16] This quoted language now appears in Tennessee Supreme Court Rule 9, § 1 as part of the Preamble.

[17] Attorneys who participate on so-called "private" social media groupings, as for example an invitation-only Facebook group or a personal Twitter account set to "private," are not immune to ethics charges. Posts on such sites are often seen by hundreds or even thousands. Otherwise innocuous behavior, such as grousing about a difficult client, can result in ethical issues when done on even a "private" social media platform, as where the lawyer's kvetch inadvertently reveals client confidences. "[P]osting information to Facebook is the very definition of making it public." *State v. Madden*, No. M2012-02473-CCA-R3-CD, 2014 WL 931031, at *8 (Tenn. Crim. App. Mar. 11, 2014).

things more prejudicial to the administration of justice than publicly fostering a view of lawyers as co-conspirators whose role is to manufacture plausible but untrue defenses against criminal charges for the premeditated use of deadly force. It promotes a cynical view of the justice system as something to be manipulated instead of respected. Moreover, while the danger to Mr. Henderson is obvious (had Ms. Houston followed Mr. Sitton's instructions), the public venue for Mr. Sitton's bad advice created a risk that others would use it as well.

We deem it appropriate to view Mr. Sitton's choice to post his comments in a public forum as an aggravating factor that justifies an increase in discipline.

### C. Uniformity and Appropriateness of Punishment

Having considered the aggravating and mitigating factors in this case, we are now "required to review all of the circumstances of the particular case and also, for the sake of uniformity, sanctions imposed in other cases presenting similar circumstances." *In re Cope*, 549 S.W.3d at 74 (quoting *Bd. of Prof'l Responsibility v. Allison*, 284 S.W.3d 316, 327 (Tenn. 2009)).

In his brief to this Court, Mr. Sitton primarily argues that the hearing panel erred in finding that he violated the Rules of Professional Conduct. He does not point to cases with similar circumstances for purpose of comparison.[18]

Noting the unique factual circumstances in this case, the Board's brief to this Court cites no similar Tennessee cases to compare for uniformity of punishment. We likewise have found none.

The Board points to three cases in other jurisdictions that involve lawyers who wrongfully advised clients to engage in criminal conduct. The first is *In re Anderson*, 791 S.E.2d 285 (S.C. 2016). In *Anderson*, the respondent attorney "made one or more false, fictitious and fraudulent statements and representations in an ongoing investigation by agents of the Drug Enforcement Agency and Homeland Security of a large-scale cocaine conspiracy that led to federal charges against multiple individuals, including a client of respondent." *Id.* at 285. The attorney admitted his conduct violated several South Carolina Rules of Professional Conduct, including one stating that "a lawyer shall not counsel a client to engage, or assist a client, in conduct that the lawyer knows is criminal or fraudulent" and another providing that "it is professional misconduct for a lawyer to engage

---

[18] Mr. Sitton does seek to distinguish cases cited by the Board to the hearing panel, but those cases are not cited in the Board's brief to this Court.

in conduct that is prejudicial to the administration of justice." *Id.* at 285–86. In a separate matter, the attorney violated other rules by mishandling client funds. *See id.* at 286. In a brief opinion, the Supreme Court of South Carolina approved discipline that suspended the attorney from the practice of law for two years. *Id.* at 285–86.

The Board next references *People v. Gifford*, 76 P.3d 519 (Colo. O.P.D.J. 2003). That case involved three matters. In the first matter, the respondent attorney misappropriated funds and made false statements, and in the second matter, the attorney knowingly converted her client's retainer. Pertinent to this case, in the third matter, the attorney counseled her client to engage in criminal conduct. *Id.* at 519–20. Specifically, the attorney advised her client to offer real estate in order to secure the "recantation of testimony by his ex-wife and another witness in a pending criminal matter." *Id.* at 522. The Colorado court determined that this conduct violated a Colorado Rule of Professional Conduct providing *inter alia* that "a lawyer shall not counsel a client to engage in conduct that the lawyer knows is criminal" and "a lawyer shall not engage in conduct that is prejudicial to administration of justice." *Id.* at 521. This incident formed part of the basis for disbarment of the attorney. *Id.* at 523.

The Board also cites *In re Edson*, 530 A.2d 1246 (N.J. 1987). *Edson* involved two instances in which the respondent attorney advised his client to fabricate evidence for a defense to a charge of driving while intoxicated. *Id.* at 1246.

In the first matter, the attorney advised a client to "manufacture a story . . . to form the basis for an extrapolation defense, that is, to demonstrate that the .14% reading overstated the actual blood-alcohol level at the time of the arrest." *Id.* at 1246–47.[19] When the first incident came to light, the local prosecutor set up an undercover operation in which a detective, posing as a prospective client, visited the attorney's office purportedly to seek representation on a charge of driving while intoxicated. *Id.* at 1247.

Advising the detective (posing as a prospective client), the attorney

concoct[ed] a series of facts included in which were a recent marital dispute and some drinks called Long Island Iced Tea (each containing three shots of liquor), which, according to respondent's proposal, were consumed hastily just before [the client] left the tavern. To fix this imaginative scenario in [the

---

[19] When the client protested that he wanted to mount a defense based on the truth, the attorney told him, "The way the real world is, is that [the police] lie and you lie back." *Edson*, 530 A.2d at 1246 (alteration in original).

- 24 -

client]'s memory [the attorney] gave his client a written memorandum of the revised facts.

*Id.* at 1248 (internal quotation marks omitted). In its opinion, the Supreme Court of New Jersey said:

> The members of this Court are not babes in the woods. We are invested with at least minimally acceptable levels of sophistication, of worldliness. Our professional backgrounds have exposed us, in varying degrees, to some of life's seamier aspects. We have travelled different roads in our professional careers. We practiced in different fields and encountered, collectively, all kinds of lawyers—most very good, some perhaps indifferent, and a mere handful bad. In short, we have been around enough that not much surprises us. But rarely have we encountered in our colleagues at the bar the kind of shocking disregard of professional standards, the kind of amoral arrogance, that is illustrated by this record. There could hardly be a plainer case of dishonesty touching the administration of justice and arising out of the practice of law.

*Id.* at 1250. The *Edson* Court commented that "members of the bar 'must possess a certain set of traits—honesty and truthfulness, trustworthiness and reliability, and a professional commitment to the judicial process and the administration of justice.'" *Id.* (quoting *Application of Matthews*, 462 A.2d 165 (N.J. 1983)). These personal characteristics, it said, "are required to ensure that lawyers will serve both their clients and the administration of justice honorably and responsibly." *Id.* Describing the attorney's actions as a "calculated course of reprehensible conduct," the Court concluded: "No judicial response short of disbarment can be considered acceptable." *Id.* at 1246.

Lastly, the Board cites a fourth case; in this one, a lawyer was disciplined for providing advice prejudicial to the administration of justice to a *non-client*. In *People v. Ritland*, 327 P.3d 914, 914 (Colo. O.P.D.J. 2014), in an effort to adopt her second cousin's baby, the attorney falsely portrayed her husband as the birth father of the child. In a related filing, the attorney counseled her husband to falsely represent himself as the birth father. *Id.*

By submitting false evidence that eventually necessitated vacation of her adoption decree, the *Ritland* court held, the attorney violated *inter alia* Colorado's ethical rule against engaging in conduct prejudicial to the administration of justice. *Id.* at 921. It found that the presumptive ABA sanction was disbarment. *Id.* at 925. It observed, however, that

- 25 -

the attorney engaged in the misconduct in furtherance of the personal interests of herself and her husband while filing paperwork any prospective adoptive parent would file, "rather than while representing a client in the traditional sense." *Id.* at 927. It found that the chances the attorney would engage in future professional misconduct were "slight" because the misconduct "did not take place in the context of a traditional client representation" and because it was "a deviation from her otherwise good character." *Id.* The court also noted that the hearing board "was struck by the almost perfect storm" of circumstances in the attorney's personal life that culminated in the misconduct. *Id.* Taking these factors into account, the court concluded that a three-year suspension was appropriate. *Id.* at 929.

In this case, the Board advocates a lengthy suspension or disbarment. As explained above, we have determined that suspension is the appropriate presumptive sanction for Mr. Sitton's misconduct. We agree with the Board that the misconduct in this case warrants far greater suspension than that imposed by the hearing panel.

First, Mr. Sitton's advice could have led to a disastrous outcome. In response to Ms. Houston's public inquiry about carrying a gun in her vehicle for defensive purposes, Mr. Sitton suggested she could "lure" Mr. Henderson into a situation in which she purportedly could use deadly force against him with no legal consequence. Had Ms. Houston followed Mr. Sitton's advice, Mr. Henderson could have ended up maimed or killed.

Second, Mr. Sitton's comments encouraged Ms. Houston to deliberately orchestrate a situation designed to support a defense for using her gun on Mr. Henderson, including deleting the Facebook thread so it could not be used as evidence against her. This is grave misconduct that goes to the heart of the administration of justice. His comments "detracted materially from the honesty, integrity, and dignity that are the hallmarks of the legal profession." *Edson*, 530 A.2d at 1249 (quoting *In re Mintz*, 503 A.2d 290 (1986)).

Third, Mr. Sitton's choice to post his remarks in a public venue "project[s] a public image of corruption of the judicial process." *In re Rosen*, 438 A.2d 316, 317 (N.J. 1981) (citing *In re La Duca*, 299 A.2d 405 (N.J. 1973)). His comments, posted for all the world to see, depict lawyers as fixers who manufacture fake defenses to evade criminal conviction. Mr. Sitton's public misconduct "tears the very delicate threads of our legal system. Our system is not based on lies and deception but on truth and honor." *Edson*, 530 A.2d at 1249.

We consider the totality of the circumstances in light of the comparative cases. Here, Mr. Sitton's disciplinary history is minimal and this incident appears to be isolated.

In contrast, in *Gifford*, the attorney counseled a client to engage in criminal conduct and was disbarred, but that attorney had engaged in other egregious conduct as well. *Gifford*, 76 P.3d at 521. In this case, Mr. Sitton's misconduct appears to be an aberration—albeit a serious one. We also note that, as in *Ritland*, Mr. Sitton's misconduct "did not take place in the context of a traditional client representation." *Ritland*, 327 P.3d at 927. None of the evidence indicates that Mr. Sitton had anything to gain from giving such misguided advice. This is in contrast with the misconduct in *Edson*, in which the attorney engaged in a pattern of misconduct and had essentially cultivated a business model as a "liar for hire." *Edson*, 530 A.2d at 1249. In this case, Mr. Sitton's Facebook comments appear instead to have been the result of a foolish, impulsive decision.

It is noteworthy, however, that Mr. Sitton failed to establish any mitigating factors in this case. No testimony was offered as to his good character. To this Court, instead of taking responsibility, Mr. Sitton minimized his actions and accused the Board of defaming him.

On balance, the appropriate discipline in this case appears to be a lengthy suspension. We find appropriate a suspension of four years, with one year served as active suspension and the remaining three years on probation. Before reinstatement to active practice, in addition to the usual CLE requirements, Mr. Sitton must complete nine hours of CLE focused on the ethical use of social media by attorneys.

"[T]his Court takes seriously its obligation to supervise and regulate the practice of law." *In re Vogel*, 482 S.W.3d at 545 (quoting *Sneed v. Bd. of Prof'l Responsibility*, 301 S.W.3d 603, 618 (Tenn. 2010)). We believe that a four-year suspension, with one year to be served on active suspension and the rest on probation, plus appropriate CLE instruction, is the minimum punishment that fulfills our duty in this case.

## CONCLUSION

Accordingly, based on our consideration of the record "with a view to attaining uniformity of punishment throughout the state and appropriateness of punishment under the circumstances of [this] case," Tenn. Sup.Ct. R. 9, § 15.4(b), we modify the judgment of the hearing panel to impose a four-year suspension from the practice of law, with one year to be served on active suspension and the remainder on probation. Additionally, prior to reinstatement to the active practice of law, Mr. Sitton shall complete nine CLE hours (online or in-person), in addition to the annual CLE requirement, pertaining to ethical use of social media by attorneys. Mr. Sitton must comply in all respects with Tennessee Supreme Court Rule 9, specifically with regard to the obligations and responsibilities of

suspended attorneys.  Costs of these proceedings are taxed to Mr. Sitton, for which execution may issue if necessary.

_____
HOLLY KIRBY, JUSTICE